609 F.2d 317
 101 L.R.R.M. (BNA) 2229, 102 L.R.R.M. (BNA) 2219,
86 Lab.Cas. P 11,313, 87 Lab.Cas. P 11,542,
87 Lab.Cas. P 11,543
 Charles N. BUCHHOLTZ and Lester J. Tauer, on behalf of
themselves and all others similarly situated,
Plaintiffs-Appellees, Cross-Appellants,
v.
SWIFT & COMPANY, Amalgamated Meat Cutters and Butcher
Workmen of North America, AFL-CIO,
Defendants-Appellants, Cross-Appellees.
 Nos. 78-1559, 78-1573, 78-1596.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 10, 1979.
Decided April 25, 1979.
Rehearing and Rehearing En Banc Denied Sept. 7, 1979.
Certiorari Denied Jan. 7, 1980.
See 100 S.Ct. 672
 
 John M. Bowlus, of Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for AFL-CIO.
 Vance B. Grannis, Jr., of Grannis & Grannis, South St. Paul, Minn., for Swift & Co.; Roger N. Knutson, South St. Paul, Minn., on briefs.
 Robert J. King, of Hvass, Weisman & King, Minneapolis, Minn., for Buchholtz and Tauer; Reed K. Mackenzie, Minneapolis, Minn., Thomas P. Lewis, Lexington Ky., and Robert F. Collins, Minneapolis, Minn., on brief.
 Before GIBSON, Chief Judge, ROSS, Circuit Judge, and VAN SICKLE, District Judge.*
 ROSS, Circuit Judge.
 
 
 1
 Appellants Swift & Company (Swift) and Amalgamated Meat Cutters and Butcher Workmen of North America (Amalgamated) appeal from an adverse judgment in the district court, after a trial to the court, which held them liable for over $1,000,000 in damages.
 
 
 2
 The plaintiffs are a class of former Swift employees who pursued claims against their former employer and former union for breach of the collective bargaining agreement and breach of the duty of fair representation.
 
 
 3
 This claim arose out of Swift's closing of its South St. Paul, Minnesota meat packing plant on November 29, 1969. Employees at that plant strongly reacted to Swift's announcement that it would pay no vacation benefits for the subsequent year, which employees urged had already been earned in 1969. According to Swift, because the plant would not be open on December 28, 1969, and because the contract provided that one requirement for vacation eligibility was that an employee be on the "active payroll" of the company on that date, none of the employees met the criteria and none were eligible.
 
 
 4
 While the union initially pressed these employees' vacation pay claim, it later settled with Swift by withdrawing the vacation pay claim and obtaining pension benefits for other employees who were then active union members. This "swap" resulted in the Settlement Agreement of June 30, 1971 entered into between Swift and Amalgamated, which barred the union's right to further press the vacation pay claim with the company. The trade was made without the participation of the former employees.
 
 
 5
 The plaintiffs thereafter came to federal court, urging that the trade of its valuable vacation pay claim by the union was a breach of the union's duty of fair representation to them, and further, that the company had wrongfully refused to pay the vacation benefits in violation of the collective bargaining agreement.[1]
 
 
 6
 The district court held Amalgamated and Swift liable, and apportioned the damages between them. In reaching its final decision, the district court concluded that it was unnecessary for the plaintiffs to have exhausted intra-union appeals, that the union by arbitrary conduct and with hostile discrimination had unfairly represented the plaintiff class, and that the company, under the court's reading of the contract, owed plaintiffs the vacation benefits. We reverse, based on our interpretation of the collective bargaining agreement.
 
 Exhaustion of Intra-union Remedies
 
 7
 In its first line of defense in the district court, Amalgamated moved to dismiss plaintiffs' complaint by contending that plaintiffs had not exhausted internal union remedies provided by Amalgamated's constitution.[2] The district court denied the motion on grounds that the plaintiffs at the pertinent time were nonmembers who lacked standing to invoke remedies provided by the internal union mechanisms.[3]
 
 
 8
 As a general rule, where a union provides its members with an appeal procedure, resort to the means of appeal is required prior to consideration of the member's unfair representation claim in federal court. If such exhaustion is required generally, however, it is certainly not the case that the courts are powerless to exercise discretion by assessing the adequacy of the remedy afforded and thus the essential utility of mandating exhaustion in a given case.[4] "Generally, the courts will require an exhaustion of intra-union remedies in the absence of some showing that to do so would be futile or that the remedies are inadequate." Foy v. Norfolk & Western Railway Co., 377 F.2d 243, 246 (4th Cir. 1967).
 
 
 9
 The Foy case, Supra, utilized a statutory section of the Labor-Management Reporting and Disclosure Act, 29 U.S.C.A. § 411(a)(4). The Proviso to that section (the Section primarily Prohibits a union from limiting the right of a member to institute an action in any court or agency) Permits the use of an exhaustion requirement of limited duration prior to a court suit or administrative action.
 
 
 10
 (4) Protection of the right to sue. No labor organization shall limit the right of any member thereof to institute an action in any court * * * Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof * * * .
 
 
 11
 29 U.S.C.A. § 411(a)(4).
 
 
 12
 In Detroy v. American Guild of Variety Artists, 286 F.2d 75, 78 (2d Cir. 1961) the Second Circuit concluded that "it appears clear that the proviso was incorporated In order to preserve the exhaustion doctrine as it had developed and would continue to develop in the courts, lest it otherwise appear to be Congress' intention to have the right to sue secured by § 101 abrogate the requirement of prior resort to internal procedures." (Emphasis added.)
 
 
 13
 From the § 411 jurisprudence the courts have, with varying outcomes, on a case-by-case basis, analyzed the futility, the adequacy of remedy, and the reasonableness of an exhaustion requirement in the context of a § 301 action alleging breach of contract and unfair representation. See Chambers v. Local Union No. 639, International Brotherhood of Teamsters, 188 U.S.App.D.C. 133, 578 F.2d 375 (1978); Battle v. Clark Equipment Co., 579 F.2d 1338 (7th Cir. 1978); Winter v. Local Union No. 639, International Brotherhood of Teamsters, 186 U.S.App.D.C. 315, 569 F.2d 146 (1977).[5]
 
 
 14
 We have carefully considered the posture of this case at the time the plaintiffs allegedly should have taken an intra-union appeal, and find no adequate remedy which such an appeal could have provided the plaintiffs.
 
 
 15
 The dispositive legal issue is whether appellant had a reasonable and substantial likelihood of obtaining redress of their grievances (if their claims were meritorious) by pursuing the internal remedies of their individual craft unions. If it is clear they could, the District Court is justified in dismissing their complaint for failure to do so. The appellants should not be denied a hearing on the merits of their claim, however, unless there was a genuine possibility that they could have obtained an adequate intra-union remedy.
 
 
 16
 Frederickson v. System Federation No. 114 of Railway Employees' Department, 436 F.2d 764, 768 (9th Cir. 1970). In the present case, not only did the union refuse to arbitrate the claim, it concededly gave up that claim to Swift in part for Swift's agreement to pay other claims in the amount of $928,200. The Settlement Agreement was then ratified by a vote of the then-members of the Local on June 21, 1971. It is difficult to understand how an appeal to the union hierarchy could have altered a binding, bilateral agreement between the union and the company, or have reversed the process at that point.
 
 
 17
 As the court said in Chambers v. Local Union No. 639, International Brotherhood of Teamsters, supra, 188 U.S.App.D.C. 133, 578 F.2d 375, in a similar situation:
 
 
 18
 The union-company position antagonistic to appellants has hardened. Appellants are confronted with a settled decision which conforms to the contentions of the Union, and Kane (the employer) is willing to implement it. That decision, reached on the merits, if not otherwise improper, is final and binding on all parties as provided by the Agreement. Recourse to internal union procedures could not conceivably change that opinion. The seniority-roster-merger question has gone too far, and involves the company too deeply, for the plaintiff-employees to expect any reasonable chance of relief from subsequent internal union complaint proceedings.
 
 
 19
 Id. 188 U.S.App.D.C. at 136, 578 F.2d at 387.
 
 
 20
 The text of the Settlement Agreement entered into between Swift and Amalgamated described their action as "final and binding":
 
 
 21
 WHEREAS, Local P-167, the International, and the Company have Now concluded a final and binding settlement of such four grievance cases in accordance with paragraph 59 of said Grievance Procedure;
 
 
 22
 NOW, THEREFORE, the International, Local P-167, and the Company agree as follows:
 
 
 23
 1. The International Local P-167 agree to withdraw from said Grievance Procedure With prejudice the following four grievance cases:
 
 South St. Paul Grievance Case No. 69-22
 South St. Paul Grievance Case No. 69-25
 South St. Paul Grievance Case No. 70-01
 South St. Paul Grievance Case No. 70-03
 
 24
 (Emphasis added.) Note also that the agreement ostensibly bound All levels of the union, both local and international, which distinguishes this case from a case Amalgamated relies upon, Johnson v. Wilson Foods Corp. & Amalgamated Meat Cutters, No. 77-2051 (D.Kan. July 5, 1978).[6]
 
 
 25
 We conclude that on this particular set of facts the chance for a Resolution, other than union affirmation of its prior action, was doubtful; neither direct relief nor renouncement of the binding agreement with the company was probable. As the Supreme Court said in NLRB v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), a case grounded on public policy considerations:
 
 
 26
 If the member becomes exhausted, instead of the remedies, the issues * * * are never reached and an airing of the grievance never had.
 
 
 27
 Id. at 425, 88 S.Ct. at 1722.
 
 
 28
 We therefore agree with the trial court that plaintiffs are excused from the requirement to exhaust, based on our view that there was no reasonable likelihood of a truly effective remedy had they pursued the process.
 
 
 29
 Breach of the Collective Bargaining Agreement Merits of the Vacation Pay Claim
 
 
 30
 We have carefully reviewed the district court's construction of the contract terms, but have reached a different conclusion.[7]
 
 
 31
 We base our differing interpretation on the actual practice of the parties under the agreement, the bargaining history, and an alternative line of judicial and arbitral authority.
 
 
 32
 The Master Agreement of 1967 between Amalgamated and Swift provided as follows, in pertinent part:
 
 Vacations
 
 33
 30. Vacation year Vacation eligibility requirements are based upon credited service. The period December 28 through the subsequent December 27 shall be considered the vacation year.
 
 
 34
 32. Subsequent vacations An employe who has received his (or her) first vacation (excluding an employe scheduled to be retired on January 1) is hereafter eligible for subsequent annual vacations as follows:
 
 
 35
 (1) On December 28, provided that on said December 28 he is being carried on the active payroll and provided that he has at all times since his last vacation been on either the active payroll or a benefit payroll;
 
 OR
 
 36
 (2) On December 28, provided that during the preceding 365 calendar days he has not been off the payroll for more consecutive days than sixty (60), Sundays and holidays included, and provided that on said December 28 he is being carried on the active payroll;
 
 OR
 
 37
 (3) On December 28, provided that during the preceding 365 calendar days he has completed 270 calendar days on the payroll and provided that on said December 28 he is being carried on the active payroll;
 
 OR
 
 38
 (4) On that date in the vacation year, following the vacation year in which the employe received his last vacation, by which the employe has either:
 
 
 39
 (a) Completed 365 calendar days of credited service without having been off the payroll for more consecutive days than sixty (60), Sundays and holidays included, while accumulating this credit for service, and provided that he is on that date being carried on the active payroll;
 
 OR
 
 40
 (b) During the preceding 365 days completed 270 calendar days on the payroll, and provided that he is on that date being carried on the active payroll.
 
 
 41
 We conclude, contrary to the district court, that eligibility for a vacation requires that an employee be on the active payroll on December 28 or on a date Thereafter ("(o)n that date in the vacation year, following the vacation year in which the employe received his last vacation * * * ."). In other words, employment on the 28th represents not merely an administrative device, but a requirement for vacation eligibility.
 
 
 42
 The district court concluded that "(a)n employee's presence on the active payroll on a specified annually recurring day * * * was not designed to reflect any part of the Service by which an employee earns a vacation," and, therefore, noncompliance should not defeat the right to a vacation. Implicit in this analysis is the conclusion that vacation Is earned by working a requisite number of days. According to the district court, the members of the plaintiff class had completed "270 days or more on the payroll of the company, thus satisfying the annual vacation year credited service requirement for a vacation."
 
 
 43
 Our review of the exhibits shows us, however, that in practice individuals who had "earned" their vacation in this manner were, nevertheless, denied vacation benefits when they were not present in the active employment of the company on the established eligibility date. While the collective bargaining agreement specifically excluded retirees, the practice was also to deny vacation benefits to those who were discharged, quit, had died, or who did not return to the active payroll due to sickness or layoffs, regardless of the number of days they had worked for Swift during the previous year.[8] This denial of otherwise "earned" benefits is supported by the testimony of Irving M. King, the union's lawyer during the time the collective bargaining agreement was in effect. King told the district court that "(w)e had no pro rata vacation under any circumstances, as I recall, for any person leaving the service of Swift and Company for any reason prior to December 28 * * * ." Richard Tagg, a long-time Swift executive, gave the same testimony.[9]
 
 
 44
 This situation existed and was tolerated, but it was also from time to time the subject of union proposals for changes. Proposed changes had included eliminating a stated eligibility date (see pp. 2821 and 2806 of transcript) and establishing a pro rata system for vacations for all severed and retired employees (see p. 2815 of transcript).
 
 
 45
 In August 1964, in a document entitled Suggested Contract Changes Swift Contract the union sought to modify provisions of the old 1961-64 contract for the new agreement in 1964-67. Among the suggested changes were proposals to permit vacation benefits for employees retiring on January 1 (which had been specifically excluded by contract) and to eliminate the "December 31st active payroll requirement" from Paragraphs 32(2) and 32(3). Another memoranda of national contract demands written at the same time sought to:1. Establish full pro-rata system on vacations for workers retired or otherwise severed.[10]
 
 
 46
 2. Clarify vacation eligibility.
 
 
 47
 (Emphasis added.)
 
 
 48
 In the ensuing 1964-67 contract the language was not eliminated, however, and only the date was changed: "(a)nd provided that on said December 28 he (the employee) is being carried on the active payroll."
 
 
 49
 In a July 1967 memoranda prepared to analyze suggested changes for the 1967-70 Agreement which followed, the union's position again had been: "(T)hat the requirement in Paragraph 32 of being on the payroll on December 28 be deleted."[11] Again, however, the language appeared in the 1967-70 Master Agreement which followed.
 
 
 50
 Our job is to ascertain as authoritatively and as accurately as possible the intent of these private parties in their agreement. We have previously approved the necessity of venturing "outside the four corners of the contract itself" to ascertain intent and to determine the rights and duties of the parties. UAW v. White Motor Corp., 505 F.2d 1193, 1197 (8th Cir. 1974), Cert. denied, 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975).
 
 
 51
 We conclude that the literal language of the agreement supports the interpretation that presence on the active payroll on December 28 is a precondition to vacation eligibility, and that this interpretation of the language is supported by the practice under the agreement and the collective bargaining history. A plant closing is obviously not identical to other causes of absence from active status on the eligibility date, but we think it is very persuasive evidence that the parties recognized that a vacation otherwise "earned" could be lost by failure to meet that condition. We do not quarrel with the general proposition that vacation pay is compensation for work; however, the parties agreed to a system with two eligibility requirements. In operation that system frequently denied benefits to employees who might have received a pro rata or full vacation benefit were it not for the eligibility date. They abided with it as to All other types of severance.
 
 
 52
 Moreover, this interpretation of the contract is supported by the reasoning in recent arbitral authority. In Kroger Co. v. Retail Store Employees, 74-2 Lab.Arb. Awards P 8633 (1975) (Goetz, Arb.), the arbitrator reviewed the contract language and the parties' practice:
 
 
 53
 Paragraph 4 provides that after an employee has qualified for his first one week's vacation, "he automatically qualifies for future one week's vacations as of January 1 of each year." Paragraphs 5 through 7 provide that after an employee has qualified for additional weeks of vacation (presumably as of his anniversary date), he "qualifies" for a future weeks vacation in the higher amount "as of January 1 of each year." Based on these provisions, it would appear that an employee has no right to any vacation pay until he has served beyond his first anniversary date, and That thereafter he does not qualify for vacation pay until January 1 of the year in which the vacation is taken. Under this interpretation, an employee who quits or who is discharged prior to January 1 of a given year cannot qualify for vacation pay for that year, regardless of how much work he may have performed for the Company during the preceding year. The uniform practice of the Company has been not to pay any vacation pay in such cases. To this extent at least, vacation pay under this agreement cannot be viewed simply as an unconditional deferred wage payable under any and all circumstances to everyone who performs any work for the Company during the preceding year.
 
 
 54
 Id. at 5370.[12] See also Duquesne Brewing Co., 60 Lab.Arb. 642 (1973) (Altrock, Arb.) (plant close down) (emphasis added). Compare moreover, the decision in Infant Socks, Inc., 51 Lab.Arb. 402 (1968) (Moberly, Arb.) where the contract provided that: "Length of employment, for the purposes of determining eligibility for paid vacations, shall be determined as of June 30 of each year." Id. at 403. Citing this provision, the arbitrator distinguished cases with a clearly stated eligibility date. "The fact that the agreement does not require an employe to be on the employment rolls as of any particular date in order to be entitled to vacation benefits distinguishes this case from Briggs v. Electric Auto-Lite, 37 Wis.2d 275 (155 N.W.2d 32), 67 LRRM 2271 (1967) * * * ." Id.
 
 
 55
 Similarly, in Telescope Folding Furniture Co., 49 Lab.Arb. 837 (1967) (Cox, Arb.) Arbitrator Archibald Cox granted vacation pay to three grievants, but would have denied it had the contract stated an eligibility date:
 
 
 56
 Employees to be eligible for one (1) weeks vacation with pay shall have worked one hundred forty (140) working days prior to August 1st of the vacation year.
 
 
 57
 (2) The agreement mentions August 1 only as a cut-off date for determining length of service and days worked in the vacation years. There is no clause stipulating that vacations shall be limited to workers on the payroll, or on the seniority list, or otherwise in the Company's employ, on August 1 or any other particular date. Such clauses are quite common in collective agreements, although they are probably omitted more often than they are included. If there were such a clause in the Telescope contract, the Company's position would be correct. In fact, there is none. The arbitrator cannot ignore the omission of such critical words.
 
 
 58
 Id. at 838. (Emphasis added.) See also American Zinc Co., 57 Lab.Arb. 1140 (1971) (Ray, Arb.) (plant closing). We distinguish Machinists & Aerospace Workers Local 2369 v. Oxco Brush Division, 517 F.2d 239 (6th Cir. 1975) because the court there found that denying vacation benefits in a "plant closing" would be inconsistent with the contract provisions extending benefits when employment was terminated for other reasons (release, resignation, layoff, death and retirement.) "These provisions are inconsistent with the position that employment on December 31st was an absolute requirement for vacation benefits." Id. at 245. In the present case, benefits were concededly denied for these "other reasons."
 
 
 59
 Accordingly, we conclude that in our opinion the plaintiffs were not eligible for vacation benefits under the terms of the contract to which each had agreed. We choose not to follow that line of authority which would prorate vacation benefits because the company's unilateral action in effectuating the shutdown made employment on the disability date impossible. Schneider v. Electric Auto-Lite Co., 456 F.2d 366, 372 (6th Cir. 1972). See also Baldwin-Montrose Chemical Co. v. International Union, United Rubber, Cork, Linoleum & Plastic Workers, 383 F.2d 796, 798 (6th Cir. 1967). We so hold not only because we do not agree with the reasoning thereof, but because in neither of these cases is there any discussion of the bargaining history of the parties or the past practices in other related situations. As set forth above, it is clear from the bargaining history and past practice in this case, the facts relating to which were not seriously controverted, that the union and its members Knew or should have known that the contract did not provide for vacation benefits upon the closing of the plant, bargained to obtain them, and settled without the requested change.
 
 
 60
 Although we do not interpret the collective bargaining agreement as providing for vacation benefits, clearly other sections of the contract provided specific and substantial plant closing benefits to the employees. According to an exhibit submitted at trial monetary termination benefits amounted to $4,606,901.91, including separation allowances and gratuity payments for retiring employees. Nonmonetary benefits included interplant transfer rights and placement on company-wide waiting lists for openings at new plants, plus 26 week advance notice of the plant's closing. This is a clear indication that the negotiators were aware of the many monetary consequences of closing the plant, but did not agree on an exception to the requirement of being on the payroll on December 28 for vacation pay purposes.
 
 
 61
 As to the liability of the union for unfair representation we hold that because there was no contractual obligation on the part of Swift to pay the vacation pay, that under the circumstances of this case and considering the duty of the union to fairly represent the older employees too, the union could not be held guilty of unfair representation.[13]
 
 
 62
 Swift never conceded that the vacation pay had any merit whatsoever and in our opinion it was correct in its position. To say now, as indicated in the dissent to the denial of rehearing en banc, that the union should have proceeded to arbitration in hopes of obtaining a favorable arbitrator's decision or a compromise settlement is second-guessing of the most blatant type. It completely ignores the rights of the older employees who were paid retirement pay as a result of the settlement agreement.
 
 
 63
 Alternatively we hold that even if the result of an arbitration on the vacation pay issue Might have resulted in an award to the plaintiffs, where the union is also processing claims for other employees which are arguably meritorious, and no clear showing has been made of bad faith in making a choice between the two claims, it cannot be said that in making the choice it made, the union unfairly represented the plaintiffs. The evidence adduced at the trial does not affirmatively show bad faith on the part of either Swift or the union and in a situation where, as here, the claim of one group of employees is highly doubtful it cannot be said that either Swift or the union acted arbitrarily or in bad faith in making the compromise decision that was made.
 
 
 64
 The district court held that the union acted in bad faith in refusing to process the vacation pay grievance to arbitration rather than drop it in favor of the retirement benefit claim, but the Cornerstone to this finding of bad faith was the trial court's legal conclusion that Swift was contractually Obligated to pay the vacation pay claimed. Since we have determined, as a matter of law, that Swift was not obligated under the contract to pay the claim (or at least in the alternative that the contract on its face didn't require it), the claim of bad faith must fall.
 
 
 65
 The other reasons given by the trial court for its finding of bad faith are not sufficient, even if true, absent a determination of Swift's contractual obligation to pay, to justify a determination of bad faith. These reasons include the filing of the grievance by the union and statements by its officers as to the validity of the grievance; Swift's alleged motivation in closing the plant when it did (which could not be imputed to the union and which was permitted under the contract); and the so-called swap. Rather, in our opinion, the union used its best judgment to obtain the maximum benefit for the largest number of its membership. It made the best of a contract it had been trying to change for several years without success.
 
 
 66
 Reversed and remanded with directions to dismiss the complaint of the appellees.[14]
 
 
 67
 Concurring Statement Upon Denial of Petition for Rehearing En banc.
 
 
 68
 HEANEY, Circuit Judge, concurring in which BRIGHT, Circuit Judge, joins.
 
 
 69
 I would deny the petition for rehearing en banc because no useful purpose would be served by such a hearing. The briefs and records have been thoroughly studied by all judges and the opinions setting forth the contrasting views are clear and concise.
 
 
 70
 While I am unable to agree, as a matter of law, that "eligibility for a vacation requires that an employee be on active payroll on December 28 or on a date thereafter," I do agree with the alternate holding of the panel, I. e., "if the result of an arbitration on the vacation pay issue Might have resulted in an award to the plaintiffs, where the union is also processing claims for other employees which are arguably meritorious," and no clear showing has been made of bad faith, it cannot be said that the union unfairly represents a group within the union when it settles one grievance and foregoes the other.
 
 
 71
 Here, the pension grievance was arguably meritorious and bad faith has not been shown.
 
 
 72
 Plant closings, or reduction in force, will always be traumatic events. Older employees will usually insist that the greatest attention be paid to seniority and pension benefits. Younger employees will inevitably feel that transfer rights or some form of immediate cash benefits are of more importance. Indeed, in this case, 931 members of the plaintiff class have already received $4,355,000 in separation allowances and gratuities. As long as conflicting claims of various groups of employees are arguably meritorious, we must permit the union and the company to negotiate a settlement of the claims or submit them to arbitration; and when they have negotiated a settlement of all claims in good faith, then we cannot entertain an employee's action in federal court to recover for an alleged breach of contract with respect to the settled claims. To do so would be contrary to established labor policy. See Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Smith v. Evening News Assn., 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).
 
 
 73
 Of course, the one exception to the rule is where bad faith has been clearly shown. That is not the case here.
 
 
 74
 Dissenting Statement Upon Denial of Petition for Rehearing En Banc.
 
 
 75
 LAY, Circuit Judge, dissenting, in which Circuit Judge McMILLIAN joins.
 
 
 76
 Upon failure of five or more judges to vote for a rehearing en banc in the above case, I wish to write this dissenting statement.
 
 
 77
 I must respectfully dissent from the denial of rehearing en banc for several reasons: (1) the panel decision is contrary to existing federal law and basic contract principles governing collective bargaining agreements;[1] (2) the panel decision ignores an independent jurisdictional basis for the claim of unfair representation against the union; (3) the panel opinion fails to recognize that existing case law under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, supports an independent claim against the union for unfair representation in this case; and (4) the panel decision fails to recognize the evidence from which a learned and experienced district judge[2] found bad faith of the union. In the context of a case involving a plaintiff class exceeding 1,000 employees and a judgment approximating one million dollars, these deficiencies of fact and law have resulted in an important decision in labor law, a decision rendered by the concurrence of only two circuit judges. These circumstances provide compelling reasons for this court en banc to reconsider the merits of plaintiffs' claim.
 
 
 78
 I. Contract Claim.
 
 
 79
 The overwhelming majority of the members of the plaintiff class[3] had completed 270 days or more on Swift's payroll in the year prior to the plant closing and therefore had satisfied the credited service requirement for vacation eligibility. The first sentence of the contract's vacation provision reads: "Vacation eligibility requirements Are based on credited service." (Emphasis added.) From this, the district court reasoned that vacation pay was "earned" for work performed in 1969.[4] Thus, the district court found "(t)he single obstacle to receipt by members of plaintiff class of vacations earned during 1969 was their absence from the company's 'active payroll' on December 28, 1969." In considering the use of the December 28 date in the contract, the district court held it was "merely an administrative device for spacing the recurring annual function of calculating an employee's . . . credited service, since the last vacation year. Such an administrative device is necessary in an ongoing enterprise; it has no relevance or function to perform in a plant close-down termination of employment situation." The panel concedes the legitimacy of "the general proposition that vacation pay is compensation for work," Buchholtz v. Swift & Co., 609 F.2d 317 at 325, No. 78-1559, slip op. at 16 (8th Cir. April 25, 1979), but it nonetheless holds that presence on the active payroll on or after December 28 is an additional and essential eligibility requirement.
 
 
 80
 Such a holding in the context of a plant closing is not in accord with the weight of federal law and gives undue emphasis to the eligibility date. Under the circumstances of this case there should be little doubt that plaintiff class had a vested right under the contract to vacation pay. Schneider v. Electric Auto-Lite Co., 456 F.2d 366 (6th Cir. 1972); Local 186, United Packinghouse Workers v. Armour & Co., 446 F.2d 610 (6th Cir. 1971), Cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972). In Armour, an action concerning the company's liability for vacation pay to its employees when it closed its plant, the court noted the approach taken in labor arbitration:
 
 
 81
 When situations such as this have arisen in the past, they have almost uniformly been resolved in the union's favor. In Mays Landing Water Power Co., 12 L.A. 861 (1949), the employer shut down before a date which . . . was clearly an eligibility date. Nevertheless, the arbitrator granted vacation pay, stating that "The (eligibility date) is simply a device for finally implementing the results of accumulated employment experience. To ignore the accumulation of such past employment experience because of the impossibility of meeting the eligibility day is to give undue determinative significance to only one of the generally qualifying tests." Id. at 863. Similarly, in L. Hyman Co., Inc., 13 L.A. 803 (1949), where the contract was again clear that employees had to be "on the payroll" on a specified date, the arbitrator adhered to the concept that vacation pay is an earned right, based primarily upon service, and that the employees were entitled to full vacation pay when the plant closed prior to the eligibility date. Accord : Star Woolen Mill Co., 14 L.A. 185 (1950). Id. at 613 (emphasis added).
 
 
 82
 Even absent the above reasons, the plaintiff class of employees are entitled to vacation pay because it was the company's action in closing the plant that prevented the employees from working until the December 28th date. Not only is that the precise holding of Schneider, supra, and Armour, supra, but it is also the alternative holding made by Judge Larson, which the panel opinion fails to discuss.
 
 
 83
 Judge Larson stated that "(e)ven if presence on the active payroll on December 28, 1969, was a condition of vacation eligibility, the company's unilateral decision to close the plant on November 29, and to terminate the members of plaintiff class on that date rendered it impossible for members of plaintiff class to meet the condition of eligibility." Accordingly, Judge Larson held that failure to satisfy the eligibility requirement would not preclude recovery of vacation pay under the contract.[5]
 
 
 84
 This analysis of the vacation pay issue in the context of a plant closing is not only supported by federal law, but also is in complete accord with traditional contract principles which provide that "(t)he occurrence of the event (i. e., presence on the active payroll on or after December 28) is eliminated as a condition if it is prevented by the fault of the promisor . . . ." 6 A. Corbin, Contracts § 1362, at 509 (2d ed. 1962). In the instant case, Swift's closing of the plant rendered the employees' performance of the condition at the South St. Paul plant impossible. Furthermore, the district court found that the plant closing date was chosen specifically by Swift in order to avoid paying earned vacations. On these facts, Judge Larson's construction of the contract seems clearly justified and correct. The panel opinion ignores this aspect of Judge Larson's ruling except to state that the panel "choose(s) not to follow that line of authority[6] which would prorate vacation benefits because the company's unilateral action in effectuating the shutdown made employment on the disability date impossible." Buchholtz, 609 F.2d at 326-327.[7]
 
 
 85
 II. Unfair Representation Claim.
 
 
 86
 Resolution of the contract claim in favor of Swift should not dispose of the claim against the union for its alleged failure to fairly represent the former employees who seek vacation pay. The union's duty to fairly represent employees, quite apart from the employer's obligation to comply with the terms of the labor contract,[8] stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). The panel decision, which gives only perfunctory attention to the unfair representation claim apart from the contract discussion, reflects either abandonment of the court's "traditional supervisory jurisdiction," Id., or a fundamental misconception of the nature of unfair representation suits.
 
 
 87
 As to the Section 301 charges, the panel has now amended its original opinion, Buchholtz, 609 F.2d at 327 to provide an alternate holding that:
 
 
 88
 (E)ven if the result of an arbitration on the vacation pay issue Might have resulted in an award to the plaintiffs, where the union is also processing claims for other employees which are arguably meritorious, and no clear showing has been made of bad faith in making a choice between the two claims, it cannot be said that in making the choice it made, the union unfairly represented the plaintiffs. (Emphasis in original)
 
 
 89
 Quite apart from the breach of contract, such an analysis ignores 28 U.S.C. § 1337, which provides jurisdiction for an employee suit against the union for breach of the duty to fairly represent without regard to the presence of a contract breach. Mumford v. Glover, 503 F.2d 878, 883 (5th Cir. 1974). Here the complaint alleges under Section 1337 the failure of the union to adequately represent the class of former union members in negotiations with Swift on the vacation pay claim. The charge is the union recognized the validity of the claim, represented it would in good faith submit the claim to arbitration and Then, without notice or representation to the former union members, totally disregarded the rights of the class by asserting the grievance was "the property of the union" and trading it for benefits to the few remaining union members benefits which by the way were not recognized or set forth in the collective bargaining agreement in any way. Discussion of the factual elements of this bad faith charge appears in part III of this dissent, but for now suffice it to say, this claim, which Judge Larson found to be valid, is totally independent of any breach of contract by Swift.[9]
 
 
 90
 Even under Section 301, however, an employee need Not prove a breach of the collective bargaining agreement as an essential element of his suit against the union for its alleged failure to provide fair representation. See, e. g., Czosek v. O'Mara, 397 U.S. 25, 28, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); Vaca v. Sipes, 386 U.S. 171, 182-83, 190-98, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Kaiser v. Local 83, 577 F.2d 642, 645 (9th Cir. 1978); Minnis v. International Union, UAW, 531 F.2d 850, 854 (8th Cir. 1975). Indeed, our court recently held that a discharged employee who had absolutely no contract right to reinstatement could nevertheless bring suit against the union for its alleged inadequate representation of his reinstatement claim in grievance procedures. Id. In Minnis the employee had presented evidence tending to demonstrate that if the union had processed his grievance, as it agreed to do, then the employer would have reinstated the employee. Notwithstanding the admitted absence of a contract breach, we held the employee's claim that the union's bad faith had resulted in his failure to be reinstated would, if proven, give rise to union liability. Accord, Kaiser v. Local 83, supra.
 
 
 91
 Here the panel fails to recognize that regardless of the ultimate merit of the breach of contract claim, if the union traded this claim off in Bad faith, such a claim of unfair representation would make the union liable under Section 301. Here the bad faith, as will be discussed, relates to trading away a claim of the vast majority of former employees for a claim favoring only a few.[10] Plaintiff need only establish that the union acted in an arbitrary and discriminatory manner in bargaining off the vacation pay claim. The ultimate issue against the union is whether they exercised bad faith in doing so. Thus, in my judgment, the panel's opinion decides the case on a point of law that ignores a central issue.
 
 
 92
 III. Bad Faith.
 
 
 93
 I turn now to discussion of Judge Larson's finding of bad faith on the part of the union.
 
 
 94
 First, one must recognize that disputes will always arise under collective bargaining agreements and a union has considerable discretion to trade off claims in good faith which in some instances will benefit certain members more than others. Swift and the union rely primarily on decisions which so hold. Nonetheless the appropriate method for analyzing "trade-offs" by the union is evidenced by the Ninth Circuit's decision in Local 13, International Longshoremen's Union v. Pacific Maritime Ass'n, 441 F.2d 1061 (9th Cir. 1971), Cert. denied, 404 U.S. 1016, 92 S.Ct. 677, 30 L.Ed.2d 664 (1972). In that decision the court cogently reasoned as follows:
 
 
 95
 We agree with appellees that a breach of the duty of fair representation would not be established merely by proof that the International union "swapped" a concession that section 17.81 applied to union officials for acceptance by the employers' association of the position that the contract limited the individual packing of sacks. In this practical world such issues, susceptible of no absolutely "right" solution, are often resolved by accommodation. Although such a choice might impose additional burdens upon union officials, including Velasquez, these burdens might be outweighed by benefits to working longshoremen. If the choice were motivated by a good-faith balancing of interests of different elements within the International union, it might well fall within the "wide range of reasonableness * * * allowed a statutory bargaining representative in serving the unit it represents." Ford Motor Co. v. Huffman, supra, 345 U.S. (330) at 338, 73 S.Ct. (681) at 686 (97 L.Ed. 1048). "Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes." Humphrey v. Moore, supra, 375 U.S. (335) at 349-350, 84 S.Ct. (363) at 372 (11 L.Ed.2d 370).
 
 
 96
 However, a union's freedom of choice between competing interests is "subject always to good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co. v. Huffman, supra, 345 U.S. at 338, 73 S.Ct. at 686. It must appear that "the union took its position honestly, in good faith and without hostility or arbitrary discrimination," Humphrey v. Moore, supra, 375 U.S. at 350, 84 S.Ct. at 372, For the union must "serve the interests of all members without hostility or discrimination toward any." Vaca v. Sipes, supra, 386 U.S. at 177, 87 S.Ct. at 910. (Emphasis added.)
 
 The court continued:
 
 97
 Recognizing that the materials before the district court would support an inference that if a "swap" occurred it was a good-faith choice between interpretations of two provisions of the contract, the evidence we have cited is also susceptible of a different inference, namely, that the International union, actuated in part by hostility toward Velasquez, elected to sacrifice him for a favorable outcome on the "belly-packing" issue. If a "swap" occurred, and if the deregistration of Velasquez rather than an alternative interpretation of section 17.81 was the true consideration, Local 13 would be entitled to judgment. If the duty of fair representation is to stand "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional powers of redress by the provisions of federal labor law," Id. at 182, 87 S.Ct. at 912 the deliberate sacrifice of a particular employee as consideration for other objectives must be a concession the union cannot make. The issue was thus largely one of purpose. Id. at 1067-68 (footnotes omitted).
 
 
 98
 This circuit has previously adopted a similar approach. In Corcoran v. Allied Supermkts., Inc., 498 F.2d 527, 530 (8th Cir. 1974), for example, this court recognized the union's "right to settle the anticipated contract dispute . . . ." However, we made it clear that the union's power is always subject " 'to complete good faith and honesty of purpose in the exercise of its discretion'." Id. (quoting Humphrey v. Moore, 375 U.S. 335, 342, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964)). In that case we upheld the union's settlement of a contract claim that "was tenuous at best," where the record showed that the settlement benefited all employees, including those complaining of the settlement, and the union after careful consideration felt the contract claim probably would not prevail.
 
 
 99
 If this were simply the case of trading one valid claim for another in order to compromise a settlement, the panel's decision would at least present a palatable result. The facts, however, reveal much to the contrary.
 
 
 100
 The evidence credited by Judge Larson reveals the following scenario, which led to the "swap" of the vacation pay grievance. On or about May 29, 1969, Swift gave notice of the plant-closing effective November 29. Swift's decision to close the plant prior to December 28 was motivated by Swift's desire to avoid liability for vacation pay. A grievance was thereafter filed protesting that the timing of the closing was designed "deliberately to avoid provisions and benefits under the Master Agreement." The union local's grievance committee processed the vacation pay grievance through the first three steps of the five step grievance procedure. The local committee members as well as the officials of the International (Amalgamated), believed the grievance was meritorious.[11] Plaintiffs were never informed by any union officials that their grievances were without merit. On July 15, 1970, after the members of the plaintiff class had been terminated, a fourth step meeting was held between Swift, the local and Amalgamated in which the union officials again pressed the claim for vacation pay. The grievance was not resolved and Amalgamated immediately requested arbitration. Arbitration was scheduled for April 1971. Amalgamated repeatedly represented to the plaintiff class that the vacation pay grievance would be arbitrated, and expressed confidence in the merits of the claim. On the eve of arbitration, however, Swift's representative became incapacitated and the arbitration was rescheduled for June 1971. On or about May 28, 1971, Swift announced an additional plant closing in South St. Paul which would affect most of the remaining employees.
 
 
 101
 The significance of this announcement cannot be overstated, for prior to this time Amalgamated's conduct had been consistent with the assurances repeatedly given by it to plaintiff class that the grievance would be submitted to arbitration. Shortly thereafter, at the union's request, Amalgamated, the local, and Swift met in two "pre-arbitration" meetings ostensibly to discuss the grievances to be resolved in the upcoming arbitration. In fact, however, the union officials' purpose for engaging in these meetings was to determine whether the current employees and union members, who would be terminated as a result of the Second plant closing, could receive extra-contractual pension insurance benefits. It is undisputed that pension benefits were not provided for in the contract and that the union had no grievance with the employer over this issue. It is also clear that the union's request for early pension benefits would not apply to any members of the plaintiff class. Swift stated that it would be willing to consider such a proposal but only if the union agreed to drop the vacation pay grievance in return. Amalgamated officials informed members of the local union that they did not have a strong bargaining position for the early pension benefits unless the vacation pay grievance was included in the negotiations. Faced with these prospects, the union, without notification to the plaintiff class, agreed to the "swap." Thus, plaintiffs' vacation pay grievances were withdrawn by Amalgamated not because the union believed they lacked merit, but rather because they were the only grievance against Swift that had "significant trading value." The trade was made without the consent or participation of plaintiffs the former employees were not notified of the special meeting at which the settlement was ratified, nor did they participate in or vote on the proposed settlement. Judge Larson found these facts sufficient to show bad faith on the part of the union in processing the vacation grievance. We simply substitute subjective judgment, in light of the record at hand, to say that this finding is clearly erroneous.
 
 
 102
 Having established the union's bad faith, it is incumbent upon the employees to show damages arising from the unfair representation. At this stage it is often crucial that the employees show a breach of contract. That is, in the typical case an employee contends that the union's unfair representation resulted in the employee's loss of contractual rights. In measuring damages, therefore, it is necessary to determine the scope of the employee's rights under the contract. If, however, the employee can show damages which are not dependent on the breach of a contract then the employee is entitled to recover notwithstanding the absence of a breach. As the Supreme Court noted in Vaca v. Sipes:
 
 
 103
 The appropriate remedy for a breach of a union's duty of fair representation must vary with the circumstances of the particular breach. In this case, the employee's complaint was that the Union wrongfully failed to afford him the arbitration remedy against his employer established by the collective bargaining agreement. But the damages sought by Owens were primarily those suffered because of the employer's alleged breach of contract. Assuming for the moment that Owens had been wrongfully discharged, Swift's only defense to a direct action for breach of contract would have been the Union's failure to resort to arbitration, compare Republic Steel Corp. v. Maddox, 379 U.S. 650 (85 S.Ct. 614, 13 L.Ed.2d 580,) with Smith v. Evening News Assn., 371 U.S. 195 (83 S.Ct. 267, 9 L.Ed.2d 246) and if that failure was itself a violation of the Union's statutory duty to the employee, there is no reason to exempt the employer from contractual damages which he would otherwise have had to pay. See pp. 185-186, Supra. The difficulty lies in fashioning an appropriate scheme of remedies.
 
 
 104
 The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer. In this case, even if the Union had breached its duty, all or almost all of Owens' damages would still be attributable to his allegedly wrongful discharge by Swift. For these reasons, even if the Union here had properly been found liable for a breach of duty, it is clear that the damage award was improper. 386 U.S. at 195-96, 197-98, 87 S.Ct. at 919-920, 920-921.
 
 
 105
 Here there is no problem measuring damages. The record is clear that, until it agreed to "throw-in" plaintiffs' vacation pay grievances, Swift had made a cash offer of only $8,000 to settle the grievances. When the vacation pay grievances were included in the settlement negotiations, the grievances were settled, Swift agreeing to provide benefits to the remaining members of the union which it valued at $928,200. Thus even assuming that plaintiffs were not entitled by virtue of the collective bargaining agreement to vacation pay, they were entitled to the value of the grievances relating thereto, which the union arbitrarily and in bad faith traded for pension and other financial benefits for the remaining members of the union. On these facts one need not be clairvoyant to determine the damages plaintiffs are entitled to recover due to the union's breach of its duty of fair representation.
 
 
 
 *
 The Honorable BRUCE M. VAN SICKLE, United States District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 Jurisdiction in this case in the district court was predicated upon 29 U.S.C. § 185
 Article XIV
 Section 3. Exhaustion of Remedies: No Local Union or other subordinate body, nor any member or officer thereof, nor any officer or member of the International Union, shall resort to any court or agency outside this International Union until all rights of membership, all forms of relief and avenues of appeal as provided by this Constitution and the Constitution of his Local Union have been exhausted.
 
 
 [3]
 The district court concluded that "(i)t would be a useless act to require plaintiffs in an unfair representation suit to exhaust internal remedies when they have Ceased to be members prior to discovery of the unfairness. Mendicki v. U. A. W., 61 L.R.R.M. 2142 (D.C.Kan.1965)." (Emphasis added.) We make no comment on this as a basis for excusing plaintiffs' nonexhaustion
 
 
 [4]
 "With these internal remedies so definitely available, resort to them, Or an adequate reason for a failure so to do, is a prerequisite to equitable relief against the union or its officers in the federal courts." Neal v. System Board of Adjustment, 348 F.2d 722, 726 (8th Cir. 1965) (emphasis added)
 
 
 [5]
 In Winter v. Local Union No. 639, International Brotherhood of Teamsters, 186 U.S.App.D.C. 315, 569 F.2d 146 (1978) the court cited two sources of possible "futility": "no adequate procedural route to the relief requested," and union hostility so great that a worker "could not hope to get a fair hearing, regardless of the procedures available." Id. 186 U.S.App.D.C. at 318, 569 F.2d at 149. Union hostility could be "inferred from the circumstances surrounding the grievance process" or shown by "citing concrete evidence of personal animus." Id. 186 U.S.App.D.C. at 318-19, 569 F.2d at 149-50. The court found no "futility" in the processes in that case
 The Seventh Circuit in Battle v. Clark Equipment Co., 579 F.2d 1338 (7th Cir. 1978) considered the issue of whether the union was capable of "granting (plaintiffs) the relief that they seek." Id. at 1343. The court also inferred that in a proper case they might consider whether the union appellate bodies were "biased or otherwise incapable of conducting an independent review of the situation." Id.
 The court, however, rejected a broad attack on the exhaustion procedures on the basis that the issues in that section 301 contract case did not involve matters of union discipline and internal policy.
 
 
 [6]
 In Johnson v. Wilson Foods Corp. & Amalgamated Meat Cutters, No. 77-2051 (D.Kan. July 5, 1978), the court was explaining that the plaintiffs' failure to exhaust had deprived the union of the opportunity to reverse itself
 The plaintiffs' failure to invoke intra-union grievance procedures deprived the International Union of two distinct opportunities to prevent the alleged breach of its duties of fair representation. First, under Article XIV, Section 1, of the Constitution, cited above, the International Union could have reversed or modified the challenged actions and decisions of the Local Union. Second, the International Union could have refused to approve the proposed plant closing agreement, thus precluding its ultimate execution under Article XXI, Section 2, of the Constitution.
 
 
 [7]
 The district court's interpretation of the contract terms was based on the following analysis: 1. Absence from the "active payroll" on December 28, 1969 was the sole obstacle to receipt of vacation pay. 2. Presence on the active payroll on a recurring date was merely an administrative device for calculating an employee's credited service since the last vacation year. 3. Presence on the designated date was not meant to reflect any part of the service for earning a vacation. 4. Use of the phrase "active payroll" was in contrast to the status of employees on the benefit payroll or on layoff. The "active payroll" language had the effect of postponing credit for being on the benefit payroll until the employee returned to the active payroll
 Moreover: 1. The date selected by the company for closing the plant was timed to avoid the vacation pay provisions of the contract, "particularly the provision that 'vacation eligibility requirements are based on credited service.' " 2. Even if presence on the active payroll on December 28, 1969, was a condition of vacation eligibility, the company's unilateral decision to close on November 29 rendered it impossible for members of the plaintiff class to meet the conditions of eligibility. 3. In light of Swift's unilateral power to select the date of closing, requiring active payroll status on the 28th would allow the company to secure a windfall on wages owed to employees.
 Further: 1. Past bargaining does not show any specific union demand for modification of the Master Agreement to provide for vacation pay for employees terminated by plant closings. Union demands "did include demands for pro rata vacation pay but such demands seemed to be focused on pro rata vacation pay for employees who retire and go on pension * * * such exclusion being contained in Paragraph 32 of the Master Agreement." 2. "Whatever the bargaining history may have been," the union never conceded that employees terminated by a plant closing were not entitled to vacation pay during the year of closing. In the June 30, 1971 Saint Paul Settlement Agreement "the Union not only did not concede that vacation pay was not payable, but * * * (provided) that it would be 'without precedent' on this subject." 3. A claim had been made by the employees in the Sioux City plant for vacation benefits when that plant closed. Pursuant to a settlement agreement the claim was paid.
 
 
 [8]
 Our review of the exhibit shows, for example, the following cases:
 No. of Days
Name Years of Last Day on Reason for Subsequent
 Credited Worked Payroll in Leaving Year's
 Service Year Vacation
 Terminated
--------------- ----------- ----------- ----------- ----------- ----------
E. L. 12 9/27/68 270 Quit None
Alverson
H. J. 37 10/6/67 279 Pension None
Barrieau
C. Dochniak 38 12/14/67 348 Deceased None
G. R. Korogi 26 10/16/68 289 Discharge None
 Another exhibit demonstrated a denial of vacation benefits to employees,
 who for reasons of sickness or accident, never returned to active status on
 December 28th, or thereafter, though their work record in the previous year
 was substantial.
 TABLE CONTINUED
 Name Last Day Reason not on Years of Days on Weeks of
 On Active Active Payroll Credited Payroll in Subsequent
 Payroll Service Last Year Vacation
 on Active Received
 Payroll
------------- --------- -------------- -------- ---------- ----------
A. J. Peltier 12/22/67 S&A 29 356 None
 
 
 [9]
 Tagg testified that based on his experience with Swift, and to the best of his knowledge, Swift had never made vacation payments to an employee who was not on the active payroll on the qualifying date and who did not return thereafter due to a plant closing or for any other reason. Trial Exhibit A-3 entitled "1961-1971 Vacations Paid to U.P.W.A. or A.M.C. & B.W. Members for Years Subsequent to Closings or Partial Closings of a Swift Plant for Which Records Are Still Available" shows that no vacation payments were generally made when a plant closed, although this exhibit must be viewed in light of its facially apparent limitation. The one exception to the general rule of nonpayment, which does appear on the exhibit, were benefits paid in the Sioux City, Iowa closing. Swift entered into a Settlement Agreement with the employees of the Sioux City plant to pay them vacation pay and the union thereby promised not to transfer employees en masse for the required One week to the nearby Omaha plant. This agreement provided that: "The above does not constitute a precedent for either party." In view of that express language, applicable to both union and company, and in view of the special circumstances involving a short distance to travel and only one week of duty required, we are unwilling to consider it at all in interpreting the collective bargaining agreement between them
 
 
 [10]
 King, the union's lawyer, testified at trial that he understood this bargaining demand would create a pro rata system for "Plant closing." (App. Vol. IV at 1651.)
 
 
 [11]
 The July 28, 1967 memoranda read as follows:
 Union Position
 (c) The Union indicated at the meeting and earlier that it had certain general proposals to make on the vacation provisions. On the basis of discussions subsequent to the meeting, the Union proposes that the 60 day break period referred to in paragraphs 31 and 32 be increased to 90 days; that the provision for 270 calendar days on the payroll be reduced to 240 days, and that the requirement in Paragraph 32 of being on the payroll on December 28 be deleted.
 (d) Other items in the Armour agreement: pro rata vacation on retirement at age 62 or later, an option of cash in lieu of vacation for retiree it is not clear whether these are problems in the Swift negotiations.
 
 
 [12]
 In relying on this decision the court is cognizant that the Kroger arbitration involved a sale of a business where the former employees were reemployed, and not a plant close down, and that the arbitrator noted that the Equities were stronger when employees were terminated by a plant shutdown
 However, the arbitrator also distinguished some of the plant close down cases from his own case on another factor: "(I)n most of the cases cited by the Union, the applicable agreements Included provisions not present here providing Contractual support for the conclusion that pro rata vacation pay should be paid." P 8633, at 5371. (Emphasis added.)
 In our view, the arbitrator's decision was grounded primarily on the contract language, which stated a vacation eligibility date, and which contained "no provision whatsoever for pro rata vacation pay." Although the present case involves a plant close down, our analysis based on the contract language is similar.
 
 
 [13]
 See Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976)
 To prevail against either the company or the Union, petitioners must not only show that their Discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.
 Petitioners, if they prove an Erroneous discharge and the Union's breach of duty tainting the decision of the joint committee, are entitled to an appropriate remedy against the employer as well as the Union.
 Id. at 570, 572, 96 S.Ct. at 1059-60 (emphasis added).
 
 
 [14]
 We have carefully considered the claims raised in the cross-appeal by the early retirees, the employees on the benefit payroll when the plant closed, and the remaining subclasses of plaintiffs who were denied vacation pay benefits. However, we conclude that the district court correctly denied these claims
 
 
 [1]
 The panel opinion concedes that it disagrees on an important question of labor law with a sister circuit. This in itself should compel a rehearing en banc. If a majority of this court would agree with the Sixth Circuit's analysis in Local 186, United Packinghouse Workers v. Armour & Co., 446 F.2d 610 (6th Cir. 1971), Cert. denied, 405 U.S. 955 (1972) and Schneider v. Electric Auto-Lite Co., 456 F.2d 366 (6th Cir. 1972), as I feel they would after a plenary study, it would provide one less case for the Supreme Court to consider involving a division between circuits in an important area of labor law
 
 
 [2]
 The Honorable Earl R. Larson, Senior District Judge, District of Minnesota
 
 
 [3]
 The record reveals that 677 employees, 74 of which were terminated early, had satisfied the credited service requirement for vacation eligibility; 47 employees were awarded pro rata vacation pay
 
 
 [4]
 This construction of the contract is hardly startling. See, e. g., Austin v. Sears, Roebuck & Co., 504 F.2d 1033, 1037 (9th Cir. 1974) ("A paid vacation is fairly understood as part of a worker's short-term return for labor; hence, treating vacation time earned as a function of actual labor performed is not unreasonable."); Foster v. Dravo Corp., 490 F.2d 55, 63 (3d Cir. 1973), Aff'd, 420 U.S. 92, 95 S.Ct. 879, 43 L.Ed.2d 44 (1975) ("Vacation with pay . . . is normally and reasonably considered part of a worker's current or short term return for labor. Under this view, actual work time during a year provides a fair measure of the amount of annual vacation currently earned."); Schneider v. Electric Auto-Lite Co., 456 F.2d 366, 371 (6th Cir. 1972) ("Absent contrary indication, vacation pay is viewed as compensation for work."); Baldwin-Montrose Chem. Co. v. International Union, United Rubber Workers, 383 F.2d 796, 798 (6th Cir. 1967) (" 'Arbitrators and courts have long recognized that vacation pay is a fringe benefit paid in lieu of a direct wage increase and in that sense constitutes deferred wages.' "); Kaftan v. Siegel, 111 F.2d 429, 432 (2d Cir. 1940) ("A vacation with pay is in effect additional wages.")
 
 
 [5]
 In addition it should be noted that Swift's purposeful and unilateral prevention of satisfaction of the active service date condition clearly distinguishes this case from instances where employees voluntarily failed to fulfill the condition or where an employer terminated employees for cause. Thus, the panel's discussion, Buchholtz, 609 F.2d at 322-327, in no way undermines the efficacy of Judge Larson's ruling based on impossibility
 
 
 [6]
 The panel's distinction of Machinists & Aerospace Workers Local 2369 v. Oxco Brush Div., 517 F.2d 239 (6th Cir. 1975) is a straw man. In Aerospace the court cited and relied upon the Armour and Schneider decisions
 
 
 [7]
 The panel's amended opinion now seeks support for its denial of plaintiffs' claim against Swift on the ground that:
 (I)t is clear from the bargaining history and past practice in this case, the facts relating to which were not seriously controverted, that the union and its members Knew or should have known that the contract did not provide for vacation benefits upon the closing of the plant, bargained to obtain them, and settled without the requested change.
 Judge Larson's specific finding and the record dispute this. Judge Larson stated:
 The past bargaining, and the plant closing history with respect to plant closings prior to the South St. Paul plant closing, taken together, do not show any specific contention by or demand by the Union for modification of the Master Agreement to provide for vacation pay for employees terminated by a plant closing, in those terms, and particularly do not show any specific contention by or demand by the Union for modification of the Master Agreement to provide for vacation pay for employees on the payroll 270 or more days prior to a plant closing. During the period for which Swift has records of closings there had been two plant closings in which the closing date was such that there were terminated employees who had 270 or more days on the payroll prior to termination, the Kearny, New Jersey closing in 1966 affecting at most 70 employees and the Sioux City, Iowa closing of December 1968 in which there were at most 176 employees affected. No claim was made by the terminated Kearny, New Jersey employees for vacation pay and none was paid. A claim was made by the Sioux City employees and vacation pay was paid.
 The contract modification demands made by the Union during the Master Agreement bargaining sessions in the years prior to 1969 did include demands for pro rata vacation pay but such demands seemed to be focused on pro rata vacation pay for employees who retire and go on pension, and these persons were specifically excluded from vacation pay that would otherwise have been earned during the year in which they retire, such exclusion being contained in Paragraph 32 of the Master Agreement.
 Whatever the bargaining history may have been, the Union never conceded that employees terminated by a plant closing, who had been on the payroll 270 or more days were not entitled to, or could not assert a claim for, vacation pay earned during the year of closing. The Union demanded and received vacation pay for the terminated Sioux City employees. In the purported settlement agreement of June 30, 1971, the Union not only did not concede that vacation pay was not payable, but in fact preserved the claim, the written agreement providing that it would be "without precedent" on this subject.
 Furthermore, Amalgamated official, Fisher testified specifically there were no written or oral demands by the union prior to 1967 relating to vacation pay in the event of plant closing. Tagg's testimony specifically corroborates this. Furthermore, assuming there were bargaining efforts which the record disputes, it is difficult to accept that futile bargaining efforts can serve to broaden rights which do not otherwise exist. And finally, as the plaintiff class so cogently argues: it is hardly possible for a plant to develop past practices concerning the resolution of problems growing out of a closing of the plant.
 
 
 [8]
 As the Supreme Court clearly stated, "(t)he claim against the union defendants for the breach of their duty of fair representation is a Discrete claim quite apart from the right of individual employees . . . To pursue their employer . . . ." Czosek v. O'Mara, 397 U.S. 25, 28, 90 S.Ct. 770, 773, 25 L.Ed.2d 21 (1970) (suit under the Railway Labor Act) (emphasis added)
 
 
 [9]
 This court's previous decision in Richardson v. Communication Workers, 443 F.2d 974 (8th Cir. 1971), Cert. denied, 414 U.S. 818, 94 S.Ct. 38, 38 L.Ed.2d 50 (1973), stated that a claim for damages arising solely from the union's unfair representation states a claim "Separate and distinct from the Union's responsibility for its apportioned damage with the employer under § 301(a). There is no procedural bar to asserting this claim along with plaintiff's suit under Section 301(a)." Id. at 983 (emphasis added)
 
 
 [10]
 The few included the officers of the union, etc
 
 
 [11]
 An Amalgamated official served on an arbitration committee involving a similar grievance that was resolved in favor of the union. In addition union officials were in contact with and discussed the vacation pay grievances with legal counsel for the Teamsters, who had a similar grievance with Swift. Counsel for the Teamsters told Amalgamated officials that he had advised the Teamsters that they had a meritorious claim. At no time did representatives of Amalgamated or its counsel represent to the Teamsters' counsel that the vacation pay claim was without merit or that Amalgamated did not want to arbitrate it