**CONNECTICUT LIGHT & POWER COMPANY, Plaintiff-Appellee,**

v.

**LOCAL 420, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Defendant-Appellant.**

**No. 21, Docket 82–7128.**

United States Court of Appeals, Second Circuit.

Argued Sept. 3, 1982.

Final Briefs Submitted Jan. 24, 1983.

Decided Sept. 15, 1983.

Norman Zolot, Hamden, Conn., for defendant-appellant.

Harold N. Mack, Boston, Mass. (Morgan, Brown, Kearns & Joy, Nathan L. Kaitz, Boston, Mass., of counsel), for plaintiff-appellee.

Before KEARSE, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Local 420, International Brotherhood of Electrical Workers, AFL–CIO, appeals from a decision by Chief Judge Daly vacating an arbitration award rendered in its favor. We affirm.

### FACTS

The Connecticut Light & Power Company ("the Company"), a subsidiary of Northeast Utilities, is a public utility which generates and distributes electricity. Local 420 of the International Brotherhood of Electrical Workers, AFL–CIO ("the Union") has represented employees of the Company at various locations throughout the State of Connecticut for many years.

During 1974 and 1975, the Company undertook the development of a work man-

agement system intended to optimize use of labor, financial and equipment resources. One aspect of this system involved the restructuring of work crews by determining crew size for any particular job according to a "pre-analysis" of the requirements of each job.

The Union was advised of the Company's consideration of the work management system in January, 1977. On January 5, 1979, the Company informed the Union that it was implementing the system and furnished a chart showing jobs commonly performed in the line department and the number of men to be assigned to each job. Among these jobs were the installation and removal of pole mounted transformers. The chart indicated that the normal crew would consist of two men, a change from the earlier practice of using three-man crews for such work. Management made a presentation demonstrating the new two-man crew methods to line department employees in the Stamford unit on May 24, 1979.

On October 19, 1979, a two-man crew from the Stamford unit was assigned to hang a transformer. The Union filed a grievance under the existing collective bargaining agreement, and, on November 15, requested arbitration. It claimed that the assignment violated Articles IA[1] and IX, Section 1[2] of the collective bargaining agreement and the "agreed to past practice of assigning three or more Line Department Bargaining Unit employees for the removal and/or installation of a pole mounted transformer in Stamford." Hear-

ings before arbitrator Alfred B. Clark began on February 26, 1980.

Two-man transformer crew assignments also occurred on October 25, November 15 and November 20, 1979. On February 29, 1980, the Union grieved these assignments and again demanded arbitration. The Company requested that proceedings in the Union's second arbitration demand be deferred and suggested that Clark's decision be dispositive of all the grievances since they raised identical issues. The Union refused and the American Arbitration Association processed the second demand for arbitration, which culminated in the appointment of arbitrator Tim Bornstein.

On September 22, 1980, arbitrator Clark issued a decision in favor of the Union. He noted that in a contract with the same union but in a different bargaining unit, the Company had agreed to a provision specifying that not less than three employees would be utilized in installing or removing transformers. Reasoning that management would not have agreed to such a provision unless safety required a three-man crew and relying upon the testimony at the arbitration hearing about the prior practice of using only three-man crews for transformer work, he concluded that the three-man crew was an essential safety measure. Because crew size was a safety issue under Article IX, Section 1, he further reasoned that the Company did not have the unilateral right under Article IA to change the practice of assigning a minimum of three men to transformer work. He ordered the Company to cease and desist from making

---

1. The pertinent provisions of that Article read:

    ARTICLE IA
    General

    Section 1. Except as otherwise provided in this Agreement, the Company reserves to itself all the customary functions of management, including among other things the direction of the working forces, the setting of working schedules, the right to hire, promote, demote, lay off, discipline, discharge for just cause, or transfer, the right to select or employ supervisory personnel, including foremen, and the right to temporarily assign for not more than six months management trainees to any classification for training purposes only without displacing any employee in such

classification or preventing the advancement of any employee from a lower classification, provided that any such management trainee shall not act in a supervisory capacity during such training period.

2. That provision reads:

    ARTICLE IX
    Safety Provisions

    Section 1. It is agreed that the Company and the Union will work together on a continuing program of safety measures for the protection of the employees, the public of Company property and of its service to customers.

assignments of less than three-man crews for pole mounted transformer work.

The hearing before arbitrator Bornstein began on October 9, 1980, and the Union submitted the Clark award. It argued that Bornstein was not only bound by the Clark award but that he was actually foreclosed from considering the merits of the grievances before him. Bornstein rejected the Union's argument and held that the Company had the right to change its prior practice of assigning three-man crews for transformer work. Although he acknowledged that the issue before him was identical to the issue decided by Clark and that consistency in arbitration awards involving the same parties and the same contract is im-

portant, Bornstein refused to defer to the Clark award because he considered it "analytically unsound." Bornstein believed that the provision of the contract covering the other bargaining unit, which explicitly required three-man crews on transformer work, highlighted the absence of a similar provision in the contract in dispute. Bornstein also rejected Clark's conclusion that transformer work crew size was frozen as a safety measure. He noted that the safety provisions of Article IX were silent as to crew size involving non-live wire work such as transformer work whereas they contained very detailed provisions as to crew size on live wire work.[3] He also noted that

3. The pertinent provisions of Article IX read: Section 6. Live wire work involving either transferring of primary wires on poles or cutting in or cutting out of slack, or handling an energized wire at two working levels shall be carried on by two Linemen or a Lineman and an eligible Progression Lineman in the A or B wage rate steps.
(a) For the purposes of this Section the following definitions shall apply:
(1) *Straight Line Pole*
A pole, in line, where the energized primary wires are carried on pin type insulators and the angle of pull is not more than eighteen feet (twenty degrees).
(2) *Corner Pole or Angle Pole*
A pole located at an angle in excess of the above or where the energized primary wires are carried on disc insulators or the equivalent.
(3) *Junction Pole*
A pole where the energized primary wires extend in three or more directions from the pole, or where the energized wires extend in two directions from the pole and are supported on crossarms attached to the pole at two different levels.
(b) The transferring of energized primary wires from a point of support on one pole to a point of support on another pole and where it is necessary to work on both poles at the same time shall be carried out in accordance with the number of qualified line department personnel described in the attached Live-Wire chart. The chart shall be interpreted within the following scope:
(1) Where the required numbers are two (2) or four (4), one-half (½) of the assigned number must be Linemen, Lead Lineman or Top Linemen or a combination of both. The remainder may include Progression Linemen in the A or B wage rate steps.
Where the required number is three (3), two (2) must be Linemen, Lead Linemen, Top

Lineman or a combination of both, the remainder may be Progression Lineman in the A or B wage rate steps.
(c) The cutting in or cutting out of slack in energized primary wires shall be carried out by two Linemen or one Lineman and a Progression Lineman in the A or B wage rate steps.
(d) The installation of energized primary taps on junction poles and elsewhere where it is current standard practice shall be carried out by two Linemen or one Lineman and one Progression Lineman in the A or B wage rate steps.
(e) It is understood that, in the event the transferring of energized wires from one pole to another also involves the cutting in or out of slack or the installation of energized primary taps, or both, the provisions of (c) and (d) of this Section shall not require Linemen in addition to those provided for in the chart.
(f) The Company may assign more than the specified number of men to carry out any of the above jobs for expediting the work or for other purposes and the Union agrees that such use of extra men shall not be considered as establishing a precedent.
(g) During 1976 Contract Negotiations discussions of the Company proposals for modifications of this Section, the Company explained that it was not its intent to change its method of assigning three-man crews as a result of the redesigning of the required number of personnel with respect to the live-wire practices, as described above and on the chart printed at page 18.
On limited occasions, a line crew consisting of two qualified line department personnel could be assigned to perform jobs listed as 1 through 3 under the heading Personnel Lifting Devices of the live-wire practices letter interpretation chart, where the jobs could be performed without the use of a lifting tong in conjunction with a holding stick.

Article IX contained other explicit and detailed provisions relating to safety and procedures to be followed in such matters.[4] From this he reasoned that silence as to

Section 6 Paragraph (h)

## LIVE WIRE CHART

The transferring of energized primary wires from a point of support on one pole to a point of support on another pole and *where it is necessary to work on both poles at the same time* shall be carried out by:

| Type of Pole[1] | Change in Level of Primary Wires | Horizontal Distance Between Pole Surfaces Level of Primary Wire on Old Pole | No Aerial Device | Personnel Lifting Device[2] | Personnel Lifting Device & Material Handling Device or Aerial Derrick[2] | Material Handling or Aerial Derrick[2] |
|---|---|---|---|---|---|---|
| 1. Straight Line | Not more than 5 ft. | Not more than 18 in. | 2 | 2 | 2 | 2 |
| 2. Straight Line | Not more than 5 ft. | More than 18 in. | 3 | 2 | 2 | 2 |
| 3. Straight Line | More than 5 ft. | Any distance | 3 | 2 | 2 | 2 |
| 4. Corner | Not more than 5 ft. | Not more than 18 in. | 3 | 2 | 2 | 2 |
| 5. Corner | Not more than 5 ft. | More than 18 in. | 3 | 3 | 2 | 3 |
| 6. Corner | More than 5 ft. | Not more than 18 in. | 3 | 3 | 2 | 3 |
| 7. Corner | More than 5 ft. | More than 18 in. | 4 | 3 | 3 | 3 |
| 8. Junction | Not more than 5 ft. | Not more than 18 in. | 3 | 2 | 2 | 3 |
| 9. Junction | Not more than 5 ft. | More than 18 in. | 3 | 3 | 3 | 3 |
| 10. Junction | More than 5 ft. but not more than 6 ft. | Not more than 18 in. | 3 | 3 | 3 | 3 |
| 11. Junction | More than 5 ft. but not more than 6 ft. | More than 18 in. | 4 | 3 | 3 | 4 |
| 12. Junction | More than 6 ft. | Any Distance | 4 | 4 | 4 | 4 |

[1] As defined in Section 6, paragraph (a)

[2] Applicable when personnel lifting devices that can be controlled from the device's work position, or aerial derricks are used and can be positioned so that both poles can be worked from the same truck position.

Numbers above refer to aloft in the work area only.

It is recognized that some line functions other than the assignments listed in the live-wire practices chart, are now performed by and will continue to be performed by a two-man line crew.

4. The pertinent provisions of Article IX read: Section 2. It is understood and agreed that the safety regulations now in effect are covered by the current issue of the Company's "Accident Prevention Manual" and the safety rules issued by the Public Utility Commission of the State of Connecticut such as may not be included in their entirety in the "Accident Prevention Manual". Any changes in the rules in "Accident Prevention Manual" shall be a matter of discussion between the parties before becoming effective. Once the company has made a decision on any such change in a safety regulation, a grievance may be initiated to determine if the Company acted reasonably in making such change. Disciplinary action for breach of the rules in the "Accident Prevention Manual" shall be subject to the terms of Article VIII hereof. Section 3. Representatives of the Company and two representatives of the Union from each Division and the Local Business Managers shall meet in February and September to discuss safety. Any conclusions reached by this committee will be followed up promptly by the Safety Section and the results will be communicated to the Business Manager and Assistant Business Manager concerned within thirty days. Within five days following any meeting of this joint committee, any Union representative may submit to the President his own report on any safety matters which this representative presented for discussion at the meeting but which did not result in a committee recommendation.

The Union shall be allowed one representative on each divisional or district safety committee.

Section 4. The Union agrees to use its best efforts to see that its members employed by the Company shall read and comply with the safety regulations made by the Company, and that its members will wear and use the protective devices and apparel to be provided in accordance with the standard practice of the Company for the protection of employees from injury. The Company agrees to use its best efforts to see that persons who supervise employees read and comply with the safety regulations. The Company agrees also to use its best efforts to see that contractors engaged in work included in bargaining unit classifications observe the Company's safety regulations or equivalent.

Section 5. Protective equipment such as safety belts, climbers, and welder's equipment will be furnished by the Company. Where required on special jobs, the Company will furnish for the use of the employees on the job, boots, raincoats, hats, asbestos gloves and other protective items which it has customarily supplied in the past.

transformer crew size implied that three-man crews were not mandatory in each case. Rather, he argued that variations in jobs and work sites precluded a finding that three-man crews were always and invariably necessary in the name of safety. In his view, some might require three or more men, others less, the safety issue to be determined in each case under Article IX. He concluded:

> the entire record in this case supports the conclusion that the practice in question—the use of three-man crews to hang transformers—is not forever frozen. Based on the rationality and legitimacy of management's reasons, I find that the contract does not bar a change in that practice, but permits a change that is consistent with the contract's safety provisions set forth in Article IX and related side letters.

On June 26, 1981, the Company advised the Union that, pursuant to the Bornstein award, it would reinstate the practice of selecting the optimum crew size for installation or removal of transformers consistent with safety requirements. In response, the Union sought a temporary restraining order requiring the Company to comply with the Clark award pending the district court's consideration of the Company's application to vacate and the Union's counterclaim to confirm the Clark award.

The district court vacated the Clark award on the grounds that "the arbitrator's fundamental concern appears to have been with the change in the practice of using three person crews, and with the dangers he presumed inhered in the reduction of crew size, rather than with the provisions of the agreement."

This appeal followed. Because we believed that the Bornstein award was relevant to our decision, we requested a supplementary briefing of the issues after oral argument and the submission of the case for decision. We affirm.

## DISCUSSION

■ Our analysis begins with a restatement of familiar principles. Federal policy favors arbitration as a dispute settlement procedure in labor management relations, *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), because it furthers the "common goal of uninterrupted production under the [collective bargaining] agreement." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. at 582, 80 S.Ct. at 1353. Arbitrators, who are chosen for their knowledge of the practices of the industry and the shop, have the primary responsibility for interpreting the agreement. Since "[t]he ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance" *id.,* judicial deference is to be shown an arbitrator's decision on the merits. So long as they draw their essence from the collective bargaining agreement, arbitration awards will not be vacated by a court since "[t]he federal policy of settling

---

\* \* \* \* \* \*

Section 7. Except in cases of necessity or emergency, employees shall not be required to do outdoor work when inclement weather conditions might make such work unsafe. In the case of line work it is considered that raining or snowing creates an unsafe condition. Under these circumstances, the Company will continue to provide other work as in the past.

Section 8. No Apprentice Lineman or Lineman C–3 shall handle higher than secondary voltages.

Section 9. No employee will be required to perform any hazardous task, with which he is not familiar, without proper instruction and close supervision.

Section 10. *Stamford Unit and New London Unit Only*—A Second Class Lineman shall not be placed on the regular "on-call" schedule unless he shall have had at least six months of service in such classification.

Section 11. Meters installed on the outside of buildings or structures will not be tested in place during rainy or snowy weather unless the meterman is sheltered from rain or snow during the testing operation.

**20**

labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 596, 80 S.Ct. at 1360. *See Nolde Bros. v. Local 358, Bakery and Confectionary Workers Union*, 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977) (upholding the continuing vitality of these well settled principles).

We are faced here, however, with an unusual situation. Although only the Clark award was challenged in the present proceeding, a second arbitrator has explicitly rejected both Clark's reasoning and his conclusion. We thus must address the question of the extent to which the deference we would customarily accord to the Clark award is affected by the existence of a second, contrary arbitration decision.

■ Although the Bornstein award has not been challenged in the present action, we believe it relevant to interpretation of the collective bargaining agreement. The reasons underlying judicial deference to arbitration awards are the arbitrator's superior "experience and competence," *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. at 582, 80 S.Ct. at 1352, and his or her selection by the parties. That superiority is vis-a-vis courts, however, not other arbitrators. Bornstein and Clark were each selected pursuant to procedures established by the parties, and each was empowered to decide identical grievances. While both may have "experience and competence" in interpreting the agreement superior to that of a judge, we perceive no reason to believe that one arbitrator is superior to the other. We conclude, therefore, that the validity of the Clark award must be determined in light of the reasoning of the subsequent Bornstein award.

■ Courts reviewing inconsistent arbitration awards have generally concluded that arbitrators are not bound by the rationale of earlier decisions and that inconsistency with another award is not enough by itself to justify vacating an award. *Westinghouse Elevators of Puerto Rico, Inc. v. S.I.U. de Puerto Rico*, 583 F.2d 1184,

1186–87 (1st Cir.1978). Principles of stare decisis and res judicata do not have the same doctrinal force in arbitration proceedings as they do in judicial proceedings, *see Butler Armco Independent Union v. Armco Inc.*, 701 F.2d 253 (3d Cir.1983); *Metropolitan Edison v. NLRB*, 663 F.2d 478 (3d Cir. 1981), *cert. granted*, 457 U.S. 1116, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982); *Riverboat Casino, Inc. v. Local Joint Executive Board of Las Vegas*, 578 F.2d 250 (9th Cir.1978); and, while it is the usual practice of arbitrators to find prior awards final and binding, *see Board of Education of Cook County*, 73 Lab.Arb. 310 (1979); *Todd Shipyards Corp.*, 69 Lab.Arb. 27 (1977), subsequent arbitrators may set aside or modify a previous award in certain circumstances. *Carbon Fuel Co.*, 67 Lab.Arb. 1038 (1976); *Big Bear Stores Co.*, 62 Lab.Arb. 1 (1973). The practice has been described in the following manner:

> it is only fair and reasonable to expect an arbitrator's decision to apply to subsequent cases of the same nature ... the refusal to apply the arbitrator's decision to similar cases leaves unsolved and unsettled the general problem covered by the decision, nevertheless ... the refusal to apply an award to cases of the same nature is justified where it is shown that any one of the following elements is present:
>
> (1) the previous decision was clearly an instance of bad judgment;
>
> (2) the decision was made without the benefit of some important and relevant facts or considerations; or
>
> (3) new conditions have arisen questioning the reasonableness of the continued application of the decision.

F. Elkouri & E. Elkouri, *How Arbitration Works* 379 (3d ed. 1973). Thus, if Clark's earlier award was, as Bornstein put it, "analytically unsound," then it was not binding on the subsequent arbitration proceedings.

■ Courts reviewing inconsistent awards have also held that neither award will be set aside where both draw their essence from the collective agreement.

*Graphic Arts, etc. v. Haddon Craftsmen, Inc.,* 489 F.Supp. 1088 (M.D.Pa.1979); *see Bacardi Corp. v. Congreso de Uniones Industriales de Puerto Rico,* 692 F.2d 210 (1st Cir.1982). While that result may seem anomalous, it is not inconsistent with the actual practice of arbitrators or with a collective agreement which contemplates different arbitrators deciding identical issues. That result is appropriate in the instant case, however, since the Clark award contains a cease and desist order against the Company ordering it to utilize three-man crews in all future transformer work. His order is thus not limited to the particular dispute before him but purports to have a binding effect on the parties in the future, thus resolving the issue with finality in favor of the Union. That result would for all practical purposes give no weight to Bornstein's view of the meaning of the collective agreement. We believe, therefore, that at least to the extent we are asked to confirm the cease and desist order, we must resolve the conflict between the two awards.

Where inconsistent awards have been made, and a need for resolving the conflict is evident, the court must, as the first step, determine whether each award, viewed separately, draws its essence from the contract. *See United Steelworkers v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361 (arbitration award legitimate only so long as it draws its essence from the collective bargaining agreement). If one does and the other does not, an appropriate order following the interpretation of the former should be entered. However, if each award, when viewed separately, has a sufficient basis in the contract to survive the *Enterprise Wheel* test, the reviewing court must move to the second step and select that interpretation which most nearly conforms to the intent of the parties. We hasten to point out that, while this approach entails a somewhat different judicial scrutiny than is normally accorded awards under *Enterprise Wheel,* the court is not independently interpreting the contract but rather selecting between awards made pursuant to the arbitration procedures adopted by the parties. The court is not free, therefore, to adopt its own interpretation, except in the highly unusual case where neither award draws its essence from the contract.

In the present case, we find that both the Clark and Bornstein awards would survive judicial scrutiny under the *Enterprise Wheel* test. The Clark award reflected his view of safety measures accepted by the parties in practice under the agreement, while Bornstein employed a somewhat more traditionalist interpretive approach. Either view is adequate under *Enterprise Wheel.* We thus move to the second step and determine which decision conforms most closely to the intent of the parties. We believe the Bornstein award to be the better reasoned decision in that it attributes the more plausible meaning to the safety articles. The Clark award relied upon past practice not as an agreement as to work rules or employment security but solely as a safety measure. Bornstein is correct in pointing out that the textual safety provisions are quite detailed and include mandatory crew sizes for certain tasks. The inference that the parties have not agreed upon mandatory crew sizes for other tasks is thus quite strong. Bornstein is also persuasive in arguing that there is almost nothing in the record to support Clark's conclusion that a three-man crew is always necessary in the name of safety or that the parties ever considered it as a safety measure. He thus effectively refuted the gravamen of Clark's reasoning. We believe that the Bornstein award, therefore, is the more persuasive of the two.

The judgment of the district court is affirmed and the Clark award is vacated.