**WAGNER DIVISION, McGRAW EDISON COMPANY, Plaintiff,**

v.

**LOCAL 1104, INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Defendant.**

No. 83–2197C(B).

United States District Court, E.D. Missouri, E.D.

March 13, 1984.

---

D.J. Sullivan, St. Louis, Mo., for plaintiff.

Barry J. Levine, St. Louis, Mo., for defendant.

## MEMORANDUM AND ORDER

REGAN, District Judge.

In this action to vacate an arbitrator's award holding plaintiff liable for vacation pay to approximately 350 of plaintiff's former employees, both parties have moved for summary judgment. The underlying facts respecting the alleged invalidity of the award are not in dispute.

Plaintiff (hereafter Company) was a party to a number of successive collective bargaining agreements with defendant Local I.U.E. Union (Union) covering the employees at the Company's Plymouth Avenue plant for whom the Union is the collective bargaining representative. The last such agreement which became effective April 2, 1982, provides inter alia (as did its predecessors) for paid vacations for periods ranging from one to six weeks, depending on length of employment, to covered employees who met the eligibility requirements. It also contains a grievance resolution procedure, culminating in arbitration, when controversies arise between the parties with respect to the meaning or application of the terms of the agreement.

As of March, 1982, when the last agreement was negotiated, the operations of the Company at its Plymouth Avenue plant had been drastically curtailed for reasons beyond its control, and its I.U.E. workforce had dwindled to less than 450 employees who, obviously, were those with the most seniority, which, if they were otherwise eligible, would have entitled them to paid vacations of five or six weeks (the average being 5.2 weeks). And since the Union had theretofore been notified that because of adverse economic conditions, the Plymouth Avenue plant would be permanently closed not later than the end of 1983 (or earlier if the Company was faced with a "beating" on price), the agreement was negotiated with the mutual understanding that by reason of the plant closing the I.U.E. employees (as well as those represented by other unions) would be permanently terminated at that time.

By October, 1982, the deterioration of the Company's ability to continue operations at the Plymouth Avenue plant had rapidly progressed to the extent that the Company was compelled to notify the Union of its intention to shut down that plant by December 22 of that year instead of the hoped-for date in 1983. The good faith of this decision and its timing is not questioned. As the result of this decision to permanently close the plant, most of the I.U.E. employees who had been working there were permanently terminated as of or shortly prior to December 22, 1982. The remaining I.U.E. employees (approximately 100) who were kept on the payroll into 1983 for a brief time in connection with the shutdown have received all the 1983 vacation pay to which they could be entitled and are not involved in the instant controversy.

In January 1983, the Union initiated the grievance procedure by contending that the Company was in violation of Article 13 of the collective bargaining agreement by refusing to pay 1983 vacation pay to the employees who had been terminated on December 22, 1982, after having been on the active payroll for 120 calendar days after July 22, 1982. The contractual provision allegedly violated by the Company is Section 3 of Article 13, which provides as follows:

> "Employees *on the payroll* as of the starting date of the vacation period *and* who have been on the active payroll for

120 calendar days or more during the 12 calendar months immediately prior to July 22 of the current year will be *entitled* to vacation benefits as follows": (followed by stated periods of vacation ranging from one to six weeks based on length of service). (Emphasis supplied). Except for the 1973 substitution of 120 days for the former requirement of 180 days, the foregoing vacation eligibility requirements were contained in each of the preceding three year collective bargaining agreements at least since 1970 and probably earlier.

The Union's grievance was submitted to arbitration after the parties failed to reach an agreement. A hearing was held on May 12, 1983, before Harry H. Platt, a Detroit, Michigan, attorney, at which the parties presented testimony and documentary evidence, and thereafter the matter was briefed in light of the evidence. On August 18, 1983, the arbitrator entered his opinion and award sustaining the grievance and requiring the Company to pay to the involved former employees vacation pay in lieu of the 1983 vacations which their termination incident to the permanent closing of the Plymouth Avenue plant prevented them from taking.

The precise issue ruled by the arbitrator was stated by him as follows:

"Did the Company violate the collective bargaining agreement by failing to pay 1983 vacation pay to employees who had been on its active payroll for 120 days or more after 22 July 1982 and were terminated as a result of the permanent shutdown of the Plymouth Avenue plant on 22 December 1982?"

However, the arbitrator misstated what we believe to be the actual issue for decision, namely, whether the terminated employees met the Section 3 eligibility requirements for a 1983 vacation.

We review the validity of the award in light of well-established principles which are well summarized in *Connecticut Light & Power Co. v. Local 420, I.B.E.W.,* 718 F.2d 14, 19 (2 Cir.1983).

"Federal policy favors arbitration as a dispute settlement procedure in labor management relations, *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), because it furthers the 'common goal of uninterrupted production under the [collective bargaining] agreement.' *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. at 582, 80 S.Ct. at 1353. Arbitrators, who are chosen for their knowledge of the practices of the industry and the shop, have the primary responsibility for interpreting the agreement. Since '(t)he ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance' id., judicial deference is to be shown an arbitrator's decision on the merits. So long as they draw their essence from the collective bargaining agreement, arbitration awards will not be vacated by a court since "(t)he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. at 596, 80 S.Ct. at 1360. See *Nolde Bros. v. Local 358, Bakery and Confectionary Workers Union,* 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977) (upholding the continuing vitality of these well settled principles)."

It follows that we may not substitute our judgment for the arbitrator unless it is clear that his decision does not draw its essence from the collective bargaining agreement.

Section 3 plainly and unambiguously sets forth the conditions, by the *fulfillment* of which an employee "will be *entitled* to vacation benefits." It necessarily follows that unless these Section 3 eligibility requirements have been met, the grievants are *not* "entitled to vacation benefits." So, too, it is clear from the use of the *conjunc-*

*tive* "and" in Section 3 that *two* such requirements were contractually established, namely (1) that the employee be "on the payroll" as of the starting date of the "vacation period," and (2) that the employee have been "on the active payroll" for 120 calendar days during the 12 calendar months (immediately prior to July 22 of the "current year."

Admittedly, as of December 22, 1982, each of the terminated employees had been on the Company's active payroll the requisite 120 day period, so that the second of the Section 3 eligibility requirements was met. However, it was (and is) the position of the Company that the terminated employees had not met Section 3's first eligibility requirement (being "on the payroll as of the start of the vacation period") and therefore are not entitled to 1983 vacation pay. In support of this contention, the Company presented uncontradicted evidence relating to past practices in identical situations as well as pertinent collective bargaining history. We briefly summarize the salient features of this evidence:

For a number of years (certainly since 1970 and apparently prior thereto), the Company had consistently construed the term "vacation period", in what is now Section 3, as referring to the calendar year in which the vacation was to be taken. In connection therewith, in administering the vacation program, the requirement that the employee be on the payroll as of the *start* (that is, the first work day) of such period was long ago modified by the Company by authorizing vacation benefits to employees who worked at least one day (but not necessarily at the start) of that year, in addition to meeting the 120 day requirement.

Acting on the basis of this construction of the Section 3 language, the Company has for years denied vacation pay to a number of employees for a year in which they did not work a day although they had theretofore met the 120 day requirement. For example, some 34 laid-off employees had been denied 1982 vacation benefits on the basis of the Company's construction of the identical language in the earlier con-

tract. Of these 34, only one employee, James Riley, insisted that the Union file a grievance, the denial of which was not, however, carried to arbitration. And consistently with its uniform construction of Section 3, vacation benefits were paid to the approximately 100 I.U.E. employees who had been kept on the payroll in 1983 for a very short period of time.

That the Company had for years made known to its employees and to the Union its construction of the Section 3 language as well as its implementation of that construction was conceded by the Union's witnesses. Other than the instant grievance and that of Riley, there is no record of any grievance ever having been filed taking issue with the Company's construction of the Section 3 language. To the contrary, the evidence is uncontradicted that on a number of occasions affected employees and union officials would meet with Company representatives in an effort (sometimes successful and other times not) to find some way under the seniority provisions or otherwise to get an employee back on the payroll "for that one day" in order to meet the eligibility requirements. In addition, in an unrelated 1980 arbitration hearing, the then president of the Union, Raymond Hagan (who was not called by the Union as a witness in this case although he was available), testified that under the contract employees laid off in one year after earning their 120 days credit would not be able to draw their vacation the following year simply because they were not on the payroll, adding, *"They must work one day in the current year* in order to be eligible for their vacation, although they've got their credit the prior year."

Confirmatory of the Union's acceptance of the Company's longstanding construction of the Section 3 language in the prior contracts, is the evidence of the bargaining history relating to that section during the negotiations for the latest (1982) agreement. With the knowledge of the possibility (though not the certainty) that the plant would be permanently shut down before 1983, the Union submitted several pertinent

written proposals for changes in Article 13 of the agreement, one of which was to delete from Section 3 the words "on the payroll as of the start of the vacation period", the effect of which, if agreed to, would have been to eliminate the first requirement as construed by the Company. The uncontradicted testimony was to the effect that Mr. Hagan, at the bargaining table, asserted that such was the purpose of the proposed change. Other significant Article 13 proposed changes will be adverted to infra. That the Union ultimately agreed to withdraw its proposed changes is readily explainable by the fact that as of March, 1982, it appeared probable that the contemplated plant shutdown would not occur until some time during the summer of 1983 (or, as some Union witnesses testified, in December, 1983) so that the grieving employees and others who by then would have met the 120 day requirement would also have met the other Section 3 requirement.

It must not be overlooked (as apparently it was at the arbitration hearing) that nothing in Section 3 mandates that the 120 day work requirement be met entirely (or even in part) in the last five-plus months of the calendar year *prior* to the year in which the vacation is to be taken. Consistently with Section 3, had the plant not shut down, an employee whose 120 day tenure on the active payroll after July 21, 1982 was entirely in the six-plus months period immediately prior to July 22, *1983* (that being the "current year") would thereby have met *both* vacation requirements as construed by the Company, and thus be eligible for the 1983 vacation pay. Only the fortuitous circumstance of the December, 1982 plant closing made it necessary (as to grievants) that they be on the active payroll the required 120 days entirely in 1982.

The Union's recognition that the Company's construction of Section 3 had become the "law of the shop" is further evidenced by its reaction to the Company's announcement in the Fall of 1982 that the plant closing would become a reality before the year's end. In the negotiations for improved severance benefits which followed, the Union requested that the Company "waive" the requirement an employee work at least a day into 1983 to be entitled to vacation pay. No contention was then made that failure to pay 1983 vacation benefits would constitute a breach of contract.

With this factual background, we turn to a consideration of the award made by Arbitrator Platt which ruled that the employees who satisfied the 120 days requirement before being permanently terminated in 1982 should receive full 1983 vacation pay even though they were not on the Company's payroll at the start of or at any time during the 1983 vacation period. In arriving at this decision, the arbitrator rejected the Company's construction of the phrase "vacation period" as used in Section 3, and held that these words must be given the same meaning as he attributed to similar phrases when used in other sections of Article 13.

He noted that Section 1 provides that "there will be two vacation closedown periods each year", the first such period during the last two weeks in July and the second at Christmas time, and that *no* employees other than those specifically requested to do so will work during those periods. Inasmuch as employees who did not work during the two periods the plant was closed would otherwise receive no pay for those periods, employees who were eligible for vacations were required to schedule their vacations to coincide with those periods to the extent possible. All other employees would be considered as laid off during the "vacation closedown periods." On this premise, the arbitrator concluded that the "vacation period" specified in Section 3 "must" be one or the other of these two vacation "closedown" periods. However, the arbitrator overlooked the provision of Section 4 which granted to employees eligible for three or more weeks of vacation the right to schedule their vacation "*at a time of their choice*, a time which, obviously, could be *prior* to the start of the "vacation closedown period."

To support his conclusion, the arbitrator adverted to two other sections (5 and 7) of Article 13. He particularly relied on Section 5, stating that although it "was not written with the present dispute in mind", its use of the phrase "vacation period" "is so perfectly unambiguous that it settles the present controversy over the meaning of that phrase."

Section 5(a) pertains to *new* employees who have met both of the general eligibility requirements of Section 3, but who nevertheless are not eligible for a vacation under Section 3 by reason of not having accumulated at least one year of service prior to July 22 of the current year. As to such employees, Section 5(a) provides that if the employee's "service date" is such that if his service is not thereafter interrupted he will have an accumulated length of service of a year prior to the end of that calendar year, the employee shall take a one week vacation without pay during the *"regular"* vacation period as designated by the Company for which he will later be paid on the date he has the requisite one year of accumulated service.[1] For the balance of the vacation closedown period, such employee is "considered as laid off." (Section 5(b)).

We do not discern any necessary inconsistency between the Section 5 reference to "vacation period" in the *context* of that section and the Company's construction of these words as used in Section 3. Wholly apart from the fact that the Company has never contended that its construction is literally required, there is an entire absence of *any* evidence whatever relating to the *parties* construction of Section 5. We add that the arbitrator inadvertently misstates the Company's position by his erroneous assumption (stated repeatedly) that as construed by the Company, Section 3 *necessarily* requires that the 120 day requirement

be satisfied in the year *prior* to the vacation year. Equally erroneous is the arbitrator's expressed assumption that under Section 3, the vacation an employee takes in one year is necessarily earned by his working the specified 120 days *during the year before*. As noted supra, the fact that the 120 days are worked entirely in the *prior* calendar year is irrelevant to the employee's entitlement to a vacation in the *following* calendar year.

Section 7, according to the arbitrator, puts to rest "any lingering doubt over the meaning of 'vacation period'." Again, however, we see nothing in Section 7 which is inconsistent with the Company's construction of Section 3. Section 7 deals with employees *who, after having met the eligibility requirements for a vacation,* are on layoff or on sick, maternity or military leave at the time of "the *regular* vacation period, in which case they will receive their vacation pay at that time."[2]

Clearly, under that section, once an employee has met the two eligibility requirements (the plural is significant), that employee is entitled to the specified vacation *benefits*. It is to be noted that Section 4 provides that "all employees are expected to take their full vacation *time* rather than pay in lieu of vacation." However, when, by reason of absence from the payroll due to being on layoff or sick leave at the time of a scheduled *closedown* period (that is, the *"regular* vacation period) he is precluded from taking the vacation or any part thereof at *that* time (a requirement of the Company as to employees on the active payroll), he will nevertheless receive his vacation *pay*. Section 7 merely clears up any question as to *when,* in *such* case, the Company is obligated to make the *agreed* payment by specifying it be made at *that*

---

1. Included in the Union's proposed changes in Article 13, were one (consistent with its proposed change in Section 3) to delete the words "but who is on the payroll on the starting date of the vacation period", and another, to delete the requirement that the new employee take a one week vacation without pay during the regular vacation period.

2. A further provision of Section 7, to which the arbitrator fails to advert, states that "laid off employees who have otherwise met the eligibility requirements for a vacation will receive their *remaining* vacation pay at the time of layoff, provided they agree to a break in service at the time of layoff."

time (namely, the time of the regular, close-down, period.[3]

Whether or not the use of the phrase "vacation period" in Sections 5 and 7 is "perfectly unambiguous", as the arbitrator believes, is beside the point. Whatever its use in *those* sections, such use neither could nor does it *"settle the present controversy* over the meaning of that phrase" as used in *Section 3.* It should be self-evident not only that the context in which the words are used in each section, but also *the interpretation placed upon the language in a particular section by the parties, as evidenced by their acts and conduct,* should not be disregarded.

Yet, in stating that the Company was "mistaken" in its interpretation of the phrase "vacation period", the arbitrator ruled that the uncontradicted evidence of the past practices and bargaining history was "without significance." And adverting to the fact that for a number of years the Company had, with the knowledge of the Union, uniformly applied its construction of the phrase "vacation period" in denying as well as in granting Section 3 vacation benefits, the arbitrator asserted that such evidence "does not establish the *correctness* of the Company view" and "cannot override the *indisputable meaning of the language* of the Contract" (as derived by him) from its use in Sections 5 and 7.

For the purpose of reviewing the validity of the award, the question is *not* whether the Company's construction of the phrase "vacation period" as used in Section 3 is the better one or even whether such construction is consistent with the use of similar words in other sections of Article 13. Unquestionably, if we are limited solely to the language in the contract in determining whether this phrase is susceptible of the construction given to it by the arbitrator, then we must accept that interpretation whether or not we agree with it. However, where, as here, the arbitrator has both disregarded and misstated the uncontra-

dicted evidence of the past practices and the bargaining history on critical matters, we are not so limited.

In his Opinion, the arbitrator asserts, with *no* evidentiary support whatever, and contrary to the uncontradicted evidence, that "the record shows a *long history of controversy* on this matter, the Union making *repeated* efforts to adjust the language in the contract", and concludes, on this erroneous premise, that "the *fact* that the Union has *repeatedly* contested the Company's interpretation, and *contests it now,* shows that there was no agreement by the Union to the 'additional day' requirement." To the contrary, there is *no* evidence of *any* "controversy" prior to the filing of the Riley grievance in 1982 (which the Union abandoned) and the *only* effort to "adjust" the language of the contract was in March, 1982 in bargaining for the latest contract. Even that effort was not based on any *controversy* as to the correctness of the Company's interpretation or its right to so interpret the language of the prior contracts, but rather was an attempt to *change* it in the *future.* So, too, the arbitrator's comment to the effect that the Company's consistent interpretation of Section 3 was meaningless, for the alleged reason that employees who satisfied the 120 days of work requirement and continued in the Company's employ "always eventually received the vacations they had earned the year before", is contrary to the evidence. No specific instance supportive of this conclusion was cited by any witness or by the arbitrator. Had that been true, there would have been no reason for the Union to seek a change in the 1982 contract negotiations.

We add the significant fact that in the period from 1970 to the negotiations for the current contract at least *four* other contracts had been negotiated. Yet there is not a scintilla of evidence that in the bargaining for *any* of these prior contracts, the Union (although well aware of

---

**3.** Also included in the Union's proposed changes in the 1982 contract was one to delete from Section 7 the words "at the time of the regular vacation period" and instead provide "upon request will receive vacation pay."

the Company's construction and application of Section 3) sought any change in its language other than the one in 1973 to reduce the former 180 days of work requirement to the present 120 days.

Under the uncontradicted evidence, the Company's interpretation which had been consistently followed in granting or denying vacation benefits under the prior contracts in effect since 1970 (and probably earlier) had clearly become the "law of the shop" when the identical language so interpreted, with the knowledge of the Union, was agreed to in 1982. Also of importance is Article 6 of the contract which authorizes the Company to establish "vacation rules not in conflict with the agreement." The evidence makes clear that the Company did precisely that years ago when it established its rule relating to "vacation period."

· Even if it be assumed that the arbitrator's construction of the phrase "vacation period" is correct, the more important eligibility requirement of Section 3 is that the employee be *"on the payroll"* at the start of such period. Although the contract does not in terms define the words "on the payroll", there can be no question but that the terminated employees were separated from and were not "on the payroll" as of their termination on December 22, 1982, or, a fortiori, as of the start of the "vacation period", whatever be the meaning of that phrase. The Union does not contend otherwise. And in truth, the arbitrator himself in effect so found as a fact, by holding (in spite of the explicit provision of Section 3 prescribing *two* requirements for *entitlement* to vacation benefits) that the terminated employees had nevertheless ."earned" their vacation benefits by working the requisite 120 days.

The arbitrator rationalized that inasmuch as there could be no vacation "closedown" period in 1983 because the plant is permanently closed,[4] the employees who had been

"laid off, permanently, due to lack of work", could not take vacations then, and so were excused from complying with the requirement they be "on the payroll" in 1983. And in so reasoning (without explanation), he appears to have equated the situation of employees who have been *permanently terminated* by reason of the permanent plant closure to that of employees who have been "laid off due to lack of work" in a plant which continues in operation, and who can expect a recall. Nothing in Article 13 warrants such a construction. Even so, Section 7, to which the arbitrator adverts, expressly conditions *entitlement* to vacation payments to those who have "otherwise *met the eligibility requirements* (in the plural) of Section 3. As noted supra, one of the requirements which laid off employees must have met is that they "be on the payroll" as of the time set forth in Section 3.

In the only Eighth Circuit case of which we are aware, which comparably to the instant one, involved entitlement to vacation benefits as affected by a plant closing (*Buchholtz v. Swift & Co.*, 609 F.2d 317 (8 Cir.1979)), the Court held that employees who were not "on the payroll as of the date specified in the collective bargaining agreement could not recover vacation pay. In so ruling, *Buchholtz* held that presence on the payroll at the time specified "is a precondition to vacation eligibility", a conclusion which was fortified by *"the practice under the agreement and the collective bargaining history"* 609 F.2d, at 325. And in the instant case, as in *Buchholtz*, "it is clear from the bargaining history and past practice in this case, the facts relating to which were not seriously controverted, that the union and its members knew or should have known that the contract did not provide for vacation benefits upon the closing of the plant, bargained to obtain them, and settled without the requested change." 609 F.2d at 327.[5]

---

**4.** Unlike other cases, the Union has conceded that the timing of the plant closing was not for the purpose of evading or avoiding vacation pay

liability. The good faith of the company was admitted.

**5.** We add that the undisputed facts in the instant case are much stronger than those in *Buchholtz*,

Broad as is the authority of an arbitrator, he may not excise from the contract or ignore any of the *specific* provisions thereof. Assuming that the arbitrator could reject the long-standing interpretation placed upon the words "vacation period" by the "law of the shop" and conclude that they refer to the vacation closedown periods, it is nevertheless true that, whatever be the meaning of the words "vacation period" or the time of the start of such period, the employee must be *"on the payroll"* as of the start of such period to be "entitled" to vacation benefits. Unlike the language of many of the contracts construed in other cases, Section 3 *expressly* so requires.

An arbitrator may not under the guise of interpretation rewrite or revise a labor contract in a manner which is not supported either by the language chosen by the parties or by the evidence. The decision of Arbitrator Platt eliminates from Section 3 this *conjunctive* eligibility requirement for *entitlement* to vacation benefits. As stated supra, what the arbitrator ruled was that in spite of Section 3, any *terminated* employee who had satisfied the obligation to work for the requisite 120 days is solely by reason thereof entitled to vacation benefits, even though he was not "on the payroll" either at the start of or at any time during the "vacation period." Such ruling, in light of the evidence, does not draw its essence from the collective bargaining agreement. This is a classic case of an arbitrator impermissibly dispensing his own brand of industrial justice.

In our consideration of the Company's claim that the arbitrator acted arbitrarily, we do not overlook but do not base our holding upon the fact that an identical grievance involving the identical issue was ruled in favor of the Company by another arbitrator, Raymond Roberts, a Missouri lawyer. That grievance had been filed by a local of the Machinists Union based on another contract, the language of which, however, in every relevant respect is identical to the vacation eligibility provisions of Section 3 of the I.U.E. contract. So, too, the Company's long-standing construction and application of that language in granting and denying vacation benefits was in all respects the same as that of Section 3. The Machinists' claim of entitlement to vacation benefits was on behalf of the members of that union who, together with the I.U.E. employees, had been permanently terminated on December 22, 1982, incident to the permanent closing of the Plymouth Avenue plant.

The Machinists' grievance was decided while Arbitrator Platt had the I.U.E. grievance under advisement. A copy of the Roberts' Opinion and Award holding that the Machinists were not entitled to 1983 vacation pay because they had been *terminated* and neither were nor could be on the Company's payroll in 1983, was supplied to Arbitrator Platt and discussed at length in the Company's brief. Inexplicably, Arbitrator Platt made no reference whatever to the Roberts' award in arriving at a diametrically opposite conclusion, although he cited other awards involving entirely different facts.

It is, of course, true that Arbitrator Platt was not bound to follow the Roberts' award nor to agree with its reasoning. *Connecticut Light & Power Co. v. Local 420, I.B.E.W.* 718 F.2d 14, 15, 20 (2 Cir. 1983). However, in light of the fact that both grievances involved the same company and the same contractual language and the same December 22, 1982 plant closing and permanent termination of the employment relationship, we believe that Arbitrator Platt's failure to advert to the Roberts' award is significant as bearing upon the arbitrary nature of his decision.

which mandated a denial of vacation benefits. Thus, in *Buchholtz,* the very first sentence of the contract's vacation provision stated that "Vacation *eligibility* requirements are based on credited service." No comparable provision is here present. And as to the effect of the plant closing or the necessity of satisfying the "on the payroll" condition of vacation eligibility, the date of the plant closing in *Buchholtz* "was chosen specifically by (the Company) *in order to avoid paying earned vacations"*, whereas in the instant case the Company was *not* so motivated.

248

In our judgment, the award of Arbitrator Platt is so unfounded in reason and fact, so unconnected with the language and purpose of Section 3, as to "manifest an infidelity" to his obligation to frame an award which "draws its essence from the collective bargaining agreement." *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424. It follows that we "have no choice but to refuse enforcement of the award."

Accordingly, IT IS HEREBY ORDERED that the motion of defendant for summary judgment should be and it is HEREBY OVERRULED, and that the motion of plaintiff for summary judgment should be and it is HEREBY SUSTAINED. Judgment will be entered in accordance herewith vacating the award.